[Civ. No. 6229.  Third Appellate District.—February, 8, 1940.]

E. I. KIRK et al., Appellants, v. CHARLES G. JOHNSON, as State Treasurer, etc., Respondent.

Thomas V. Cassidy, Wallace F. Mills and Harry C. Hedberg for Appellants.

Earl Warren, Attorney-General, and James J. Arditto, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The plaintiffs, who are engaged in the business of buying and selling dairy cows in Los Angeles County, have appealed from a judgment rendered against them in a suit to recover retail sales taxes which were paid under protest. The case was tried in Sacramento County. The court determined that the plaintiffs were engaged in selling to consumers tangible personal property which subjected them to the payment of excise taxes under the California Retail Sales Tax Act. (Stats. 1933, p. 2599, Deering's Gen. Laws, 1933, p. 2360, Act 8493, and amendments of 1935, p. 1256, Deering's Gen. Laws, 1937, p. 3892.) Judgment was rendered to the effect that plaintiffs take nothing by their action.

It is contended by the appellants that the findings and judgment are not supported by the evidence for the reason that the cattle were sold to persons for the purpose of "resale" only, and because they constituted "food products for human consumption" as that term is defined in section 5 (e) of the act. It is asserted the sales of cattle involved in this suit are specifically exempt from taxes under both sections 2 (c) and 5 (e) of the act, and that the collections of the taxes were therefore illegally enforced.

Under the circumstances of this case, the question regarding the character of the businesses is one of fact. (*National Ice & Cold Storage Co.* v. *Pacific Fruit Express Co.*, 11 Cal. (2d) 283, 287 [79 Pac. (2d) 380].) The court found that each of the plaintiffs was engaged in retailing tangible personal property, and upon the contrary that they did not transfer title to the cattle for the mere purpose of resale by the purchasers for human consumption. The court further found that the retail sales taxes were lawfully levied and collected pursuant to the provisions of the California Retail Sales Tax Act. The only question for us to determine is whether there is substantial evidence to support those findings.

The findings and judgment are amply supported by the evidence. Section 2 (c) of the act defines a "retail sale" or a "sale at retail" as a sale of any tangible personal property "to a consumer or to any person for any purpose *other than for resale in the form of tangible personal property*". Section 5 of the act provides in part:

"There are hereby specifically exempted from the provisions of this act and from the computation of the amount of tax levied, assessed or payable under this act the following:

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"(e) The gross receipts from the sale of food products for human consumption. 'Food products' as used herein includes cereals and cereal products, milk and milk products, oleomargarine, meat and meat products, fish and fish products, eggs and egg products, vegetables and vegetable products, fruit and fruit products, spices and salt, sugar and sugar products other than candy and confectionery, coffee and coffee substitutes, tea, cocoa and cocoa products other than candy and confectionery. 'Food products' does not include spirituous, malt or vinous liquors, soft drinks, sodas or beverages such as are ordinarily dispensed at bars and soda fountains or in connection therewith, nor does the term 'food products' include the furnishing, preparing or serving for a consideration of any tangible personal property consumed on the premises of the person furnishing, preparing or serving such tangible personal property."

It is argued by the appellants that the cows in question were neither sold to the purchasers as "consumers" nor were they to be used by them solely for dairy purposes, but, on the contrary, that they were transferred for the chief purpose of *resales* to butchers for beef after they had been fattened. It is further asserted that the milk which was produced and sold during the process of fattening constituted "milk products", and that the beef came within the definition of "meat products", which by-products, together with the cattle which produced them, are exempted from the application of the act as provided by section 5 (e) thereof.

Neither the meat nor the milk was taxed. The sales of cattle, which produced the milk and the meat, are not to be confused with the by-products which are specifically exempted from taxation. The act does not exempt the cattle.

The plaintiffs are cattle dealers. They purchased cows and sold them to various dairymen in Los Angeles County. The dairymen bought cows in their prime to be used chiefly for the milk which they produced. The cattle belonged to the breeds which are commonly known to produce the largest quantity and the best quality of milk. Most of them were the Holstein, Guernsey or Jersey strain of dairy cows. They were actually used by the purchasers for an average period of about two years and three months before they became unprofitable as milk cows. They were kept in corrals and intensively fed with the express purpose of producing the largest possible quantity and the highest quality of milk for the market. Dairy cows are valued in proportion to the number of pounds of milk they produce daily and the richness of the butter-fat which it contains. Sometimes they are sold with a guaranty of producing a specified number of pounds of milk per day, and they are paid for accordingly. Under ordinary conditions a dairy cow is in its prime and produces the maximum quantity of milk between the ages of six and nine years, although some cows continue to remain profitable milkers to an age of ten or twelve years. When dairy cows become unprofitable because the cost of their feeding and care exceeds the proceeds derived from the sale of their milk, the cows are then usually fattened by feeding concentrates containing a high degree of protein, and then sold to slaughter houses to be butchered and resold as meat and meat products. The record contains evidence that the aggregate value of the milk which a dairy cow produces is nearly double the amount which it brings when it is finally sold to be slaughtered and used as beef; that a typical beef animal is worth more money on the market for the purpose of meat than is a dairy cow which has been milked through its prime years; that the latter produces meat which is coarser grained and not so tender as the flesh of a typical beef animal, and that the dairy cow is therefore worth less money than the average beef animal, when marketed as meat. There is evidence that the sale of dairy cows, when their usefulness as milkers has ceased is only secondary and incidental to the chief purpose for which they are originally purchased, which is to derive profit from the sale of milk which they produce.

The affidavits of several purchasers of cattle were received in evidence. They uniformly aver that they bought dairy cows with the double purpose of using them in their dairy businesses so long as they remained profitable milkers, and that they then fattened and sold them to the butchers for beef. It was stipulated by the appellants that all dairymen purchase and replenish their herds with that double purpose in view. It also appears that the small percentage of dairy cows which die from diseases are sold to rendering plants.

We are of the opinion dairy cows which are bought for the primary purpose of first using them in a dairy business to produce milk for the market during the period of their usefulness for that purpose, which continues for an average of over two years' time, may not be said to have been purchased for "resale in the form of tangible personal property", merely because the owner intends to market them as beef, when their usefulness for the original purpose for which they were acquired has ceased. Under the circumstances of this case the dairy cattle were not bought "for resale". It is apparent that the chief purpose for which they were purchased was not for resale, but they were to be used for the benefit of the owners in conducting their dairy businesses as long as they were profitable for that purpose. The purchases of cattle in this case do not come within the exception to the Retail Sales Tax Act found in section 2 (c) thereof, and the sales are therefore not exempt from taxes on that account.

Nor are the sales of cattle exempt from taxation under the provisions of section 5 (e) of the act, merely because they produce milk or for the reason that they may finally be converted into beef, which by-products are excepted from taxable sales. It is the sale of milk and not the source from which it is produced that is exempt; just as it is the sale of "eggs and egg products" and not the hens that lay the eggs which are exempt from taxes. The exemption clause does not mention cattle or chickens. We must assume, from the failure to do so, that the legislature intended to exempt from taxation only the by-products of cattle and poultry, and not the live animals or birds.

It is true that the first clause of section 5 (e) exempts "The gross receipts from the sale of *food products for human consumption*". But a cow which is purchased for the purpose

of carrying on a dairy business is not sold *for human consumption*, although it may be devoted to that purpose after a later sale is consummated. Nor are chickens which are purchased for the purpose of conducting the business of producing eggs sold for human consumption, although they may later follow the destiny of fricasseed fowl. The essential question to be determined is whether they were sold with the intention that they were then to be used for human consumption. Of course a cow or a chicken which is sold, not to be used in conducting a business, but for human consumption, is exempt from taxation. But they are not exempt merely because, after a series of sales, they may eventually be used for food for human beings. It is not disputed that animals and poultry which are sold for the express purpose of propagation are subject to sales taxes, although they may be eventually used for human consumption. Nor are they exempt when they are used to conduct a business. The meaning of the term "food products" as it is used in that exemption clause is specifically defined. It includes merely "milk and milk products, oleomargarine, meat and meat products, fish and fish products, eggs and egg products", etc. It is significant that neither cattle nor poultry is mentioned in the exemption clause. It is the sales of by-products and not the live animals or poultry which are exempted from taxation.

The attorney-general forcefully states the same conclusion regarding the application of that exclusion clause, as follows:

"The appellants were selling 'dairy cows' and not food products. Appellants' contention, carried to its extreme, would lead to the conclusion that when a dairy cow was sold a sale was made of leather, gelatin, moving picture film, fertilizer, milk, meat, glue, etc.

"We submit that once a sale is made of leather, fertilizer, meat and glue, etc., the cow is no longer in existence and *vice versa* when a cow is sold there is no sale of its many by-products", which come into existence only after it is slaughtered.

The findings and judgment are adequately supported by the evidence. The sales of dairy cattle in the present case were not exempt from taxation. The judgment is affirmed.

Pullen, P. J., and Tuttle, J., concurred.

230

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 8, 1940.