[L.A. No. 31058. May 8, 1979.]

KAISER STEEL CORPORATION, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

■■■■■■■■■

■■■■■■■■■

**COUNSEL**

Loeb & Loeb, John S. Warren and Andrew S. Garb for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Philip C. Griffin, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**MANUEL, J.**—Plaintiff Kaiser Steel Corporation (Kaiser) appeals from a judgment denying recovery of certain sales and use taxes paid to defendant State Board of Equalization (Board) in the period October 31, 1967, through December 31, 1973. We conclude that Kaiser purchased the materials which are the subject of the disputed taxes for a "purpose other than resale" and that the transactions were "retail sales" within the provisions of Revenue and Taxation Code, section 6007.[1] We therefore affirm the judgment.

The case was tried by the court upon stipulated facts as follows: At its plant in Fontana, Kaiser is engaged in the manufacture and production for sale of steel, pig iron, and other products. Kaiser purchased certain materials to charge its furnaces and to remove impurities from the molten metal, namely, limestone, burnt lime, fluorspar, raw dolomite, burnt dolomite, bentonite, aluminum bar and shot, gravel, and aluminum magnesium alloy (materials). The removal of impurities is accomplished by combining them with the materials to form slag.

Portions of the materials were incorporated in the steel to achieve a specific quality; portions simply remained in the finished steel; portions were dissipated or lost in the manufacturing process; and portions,

---

[1]Unless otherwise noted, code sections cited herein are contained in the Revenue and Taxation Code, and all regulations referred to herein are contained in title 18 of California Administrative Code.

■■■■■

ranging from 52 percent to 97 percent of various materials, became components of the slag. None of the aluminum magnesium alloy became part of the slag; 80 percent remained in the steel product and 20 percent was dissipated. Forty percent of the aluminum bar and shot was incorporated into the steel, giving it a fine grained quality; the remaining 60 percent ended up in the slag. Only those portions of those materials which became components of the slag are at issue in this litigation.

An independent company removed the slag from Kaiser's premises, paid Kaiser 1 cent for each ton removed, reprocessed the slag, and remitted to Kaiser a 10 percent royalty on the net sales price of the reprocessed slag, which is used in a wide variety of businesses and for a number of differing purposes. Through this arrangement Kaiser recovered 8.7 percent of the cost of the raw materials (including the value of removing the slag).[2]

When it purchased the materials Kaiser either paid the sales tax (§ 6052) or gave the vendors a resale certificate (§ 6091) and later paid a use tax (§ 6094, subd. (a)). Kaiser filed claims for refund with the Board for sales and use taxes paid with respect to the materials that combined to form slag, alleging that the materials had been purchased for the purpose of resale. The company brought the instant action pursuant to section 6934 when the Board failed to take action on the claims.

The Board took the position that Kaiser purchased the materials for a purpose other than resale, namely to aid in the manufacture of steel, and that therefore the purchases were not tax exempt. Kaiser contended that it purchased the materials for the purpose of resale in the form of slag, a by-product in the manufacture of steel. Kaiser asked the court to order an apportionment of the cost of the materials between the exempt and nonexempt uses of the materials.

The trial court construed the pertinent authorities and concluded that Kaiser's "primary purpose" for purchasing the raw materials determines their taxability. It found the Board's conclusion that Kaiser

---

[2]In a typical year, 1971, Kaiser paid approximately $3.8 million for the materials and produced almost 2.5 million tons of steel which it sold for approximately $255 million; in the same year Kaiser produced almost 1.25 million tons of slag for which it received approximately $99,000 in royalties. (Kaiser credited the 1 cent per ton purchase price against the royalty.) The value to Kaiser in having the slag removed from its premises was $233,000.

purchased the materials primarily to aid in manufacturing steel was reasonable. The court therefore held that the purchases of raw materials were subject to sales and use tax. We agree.

Section 6051 provides for a tax on all retail sales. Section 6007 defines a retail sale as "a sale for any purpose other than resale in the regular course of business in the form of tangible personal property." Normally, the tax is collected by the retailer from the purchaser. (§ 6052.) If the purchaser pays the tax, then resells the property "prior to making any use of the property other than retention, demonstration, or display while holding it for sale in the regular course of business," a deduction is allowed. (§ 6012, subd. (a)(1).) On the other hand, if the purchaser gives a resale certificate to the seller (§ 6091) and thereafter makes use of the property before reselling it, a "use" tax is imposed on the original purchase price. (§ 6094, subd. (a).)

A Board regulation generally applicable to manufacturers, producers, and processors provides: "(a) Tax applies to the sale of tangible personal property to persons who purchase it for the purpose of use in manufacturing, producing or processing tangible personal property and not for the purpose of physically incorporating it into the manufactured article to be sold. Examples of such property are machinery, . . . and chemicals used as catalysts or otherwise to produce a chemical or physical reaction such as the production of heat or the removal of impurities.

"(b) Tax does not apply to sales of tangible personal property to persons who purchase it for the purpose of incorporating it into the manufactured article to be sold, as, for example, any raw material becoming an ingredient or component part of the manufactured article." (Reg. 1525.)

In determining whether a sale is taxable as a retail sale or exempt as a sale for resale, the California courts have consistently looked to the primary intent of the purchaser or primary purpose of the purchase. (*People* v. *Puritan Ice Co.* (1944) 24 Cal.2d 645 [151 P.2d 1]; *Good Humor Co.* v. *State Board of Equal.* (1957) 152 Cal.App.2d 873 [313 P.2d 640]; *Am. Distilling Co.* v. *State Bd. of Equalization* (1942) 55 Cal.App.2d 799 [131 P.2d 609]; *Kirk* v. *Johnson* (1940) 37 Cal.App.2d 224 [99 P.2d 279]; *People* v. *Monterey Ice & Dev. Co.* (1938) 29 Cal.App.2d 421 [84 P.2d 1069]; see also, *Safeway Stores* v. *State Bd. of Equal.* (1957) 148

Cal.App.2d 299 [306 P.2d 597]; *Luer Pack. Co.* v. *State Bd. of Equalization* (1950) 101 Cal.App.2d 99 [224 P.2d 744].) In *Puritan,* ice was sold to vegetable packers and shippers for use in preserving perishable products. This court held that the sales to packers and shippers were retail sales and taxable despite the fact that the packers and shippers separately charged their customers for the ice. "The essence of the matter is that the purchasers of the ice are acquiring it for purpose other than resale. They are not engaged in the ice selling business. They are selling vegetables and the use of the ice or purported sale thereof to the purchasers of the vegetables is merely an incident of that activity. It is common knowledge that the dominant purpose for the use of ice in shipping perishable produce is to preserve the produce by means of refrigeration . . ." (24 Cal.2d at pp. 651-652; accord *Good Humor Co., supra,* 152 Cal.App.2d at p. 877 [dry ice merely passed on "as an incident" of ice cream product sales activity]; *Monterey Ice & Dev. Co., supra,* 29 Cal.App.2d at p. 424 ["real purpose" of ice purchase was to furnish refrigeration as a "necessary incident" of business of selling lettuce].)

In *Kirk* v. *Johnson, supra,* 37 Cal.App.2d 224, the "primary purpose" test was applied where cows, purchased for milk production, were eventually sold for beef. The original purchase was taxable in full because the primary purpose was dairy use, not resale for beef. In *Safeway Stores, supra,* 148 Cal.App.2d 299, the company purchased cartons which were used to ship products from the warehouse to retail stores; 80 percent remained in good condition and were eventually used for crating retail customers' grocery purchases, an exempt use. The court held that the total carton purchase was subject to sales tax because Safeway first used all of them for a nonexempt purpose.

We recognize that none of the cases discussed thus far involve the purchase of materials for manufacturing. We cannot agree with Kaiser, however, that the primary purpose test has no application in the manufacturing industries. In our view, regulation 1525, quoted earlier, *is* a statement of the primary-purpose test. █ Thus, if property is purchased as an aid in the manufacturing process, it is taxable despite the fact that some portion remains in the finished product or that an incidental waste or by-product results. Conversely, if the property is purchased for incorporation as a component of the finished product, it is not taxable despite the fact that some portion may be lost or otherwise dissipated in the manufacturing process.

Our interpretation of the regulation accords with the interpretation of the Board in its tax counsel rulings. Our interpretation is also in accord with the history of the regulation and its predecessor, rule 3. That rule simply provided for exemption from sales tax of property which entered into and became an ingredient or component part of the manufactured product. In *Am. Distilling Co.* v. *St. Bd. of Equalization, supra,* 55 Cal.App.2d 799, a purchaser of chemicals used in manufacturing commercial alcohol sought refund of sales taxes paid. The chemicals were essential to and used in the fermentation and distillation process; none of the chemicals (trisodium phosphate, ammonium sulphate, and sulphuric acid), as such, became component parts of the alcohol, but some component elements of the chemicals remained in the alcohol and about 5 percent of the chemicals remained as by-products (carbon dioxide and fusel oil) which were separately sold. All of the chemical purchases were held subject to tax. In rejecting the distiller's claim for refund, the court noted that if rule 3 were construed to mean that, when any portion of the chemicals used in manufacturing alcohol remains in the finished product, the chemicals are exempt from taxation, the rule would be unconstitutional as beyond the authority of the Board's regulatory function, creating an exemption not contemplated by statute. (*Id.,* p. 804-805.) We read *American Distilling Co.* as another instance of application of the primary-purpose test.

In 1945, subsequent to *American Distilling,* regulation 1525 was substantially modified to clarify and restate in its present form the rule that the purpose of purchase determined the taxability of raw material purchases by manufacturers. The Board has utilized the "primary purpose" test in its tax rulings interpreting regulation 1525.[3] A few examples will illustrate. Directly in point is the ruling on lime and limestone used in manufacture of steel: "The purchaser is subject to sales tax on purchases of burnt lime and limestone which are used as flux agents to remove impurities in molten metal and combine with the impurities to form slag which is sold. The burnt lime and limestone are purchased to produce a chemical or physical reaction in manufacturing a product. The incidental production of a byproduct, slag, which may be resold does not change the basic use of the chemicals so as to constitute their purchase as purchases for resale." (C.C.H. 60-118.847; Tax Counsel Ruling 8/19/69.)

[3]Sales Tax Counsel Rulings are issued by the Sales Tax Division of the Board in response to requests by taxpaying individuals or businesses.

Similar rulings were made for aluminum purchases: "Where aluminum is sold for the purpose of removing oxygen from the molton steel and the greater part thereof is skimmed from the top of the ladle as slag, it is not sold for resale and sales tax applies." (C.C.H. 60-118.842; Tax Counsel Ruling 12/29/54.) "If the sole purpose of purchasing the aluminum is to incorporate it into the finished product ultimately sold, the sale of the aluminum will be treated as a sale for resale and no tax will be due even with respect to that portion lost or wasted in the manufacturing process." (C.C.H. 60-118.841; Tax Counsel Ruling 5/26/52.)

Significantly, burnt lime, limestone, and aluminum (in several forms) were among the products purchased by Kaiser and either used as an aid to manufacture the steel (all of the lime, limestone and aluminum in alloy form and 60 percent of the aluminum bar and shot) or incorporated into the steel (40 percent of the aluminum bar and shot). As in the prior rulings, the Board here considered the purpose for which the materials were purchased; its conclusion that Kaiser purchased all the materials which eventually ended up in the slag primarily for aid in the manufacture of the steel is eminently reasonable.

Given the economics of steel versus slag production, the resale of the slag is as collateral to the production of steel as the resale of cows in *Kirk* was collateral to dairy farming. It is as incidental to Kaiser's business as the resale of ice in *Puritan* and the sale of carbon dioxide and fusel oil in *American Distilling*. The primary-purpose test of *Puritan* and *Kirk* is applicable to the manufacturing industries.

Kaiser attempts to distinguish *Kirk* and *Puritan* on grounds that the uses there were successive rather than simultaneous. The argument is not persuasive. The Board has made no distinction in its rulings based upon simultaneous as contrasted to successive use. Where there are simultaneous uses but only one or primary purpose for the purchase, the entire unit of material is taxed or not taxed, depending on that purpose: "If the primary purpose of purchasing chromic acid is to supply the chrome which is applied through a plating process to articles to be sold, the chromic acid is purchased for resale, even though the acid contains ingredients which aid in the application of the chrome to the articles." (C.C.H. 60-118.31; Tax Counsel Ruling 6/29/51.) Conversely, use of forged steel balls to grind silica sand to a desired fineness determines the taxability of the purchase of the balls as a retail sale, even though in the

course of grinding the balls wear out and all of the steel from the balls eventually becomes a part of the product. (C.C.H. 60-118.41; Tax Counsel Ruling 5/16/52.)

Similarly, when the entire unit is first utilized as an aid in processing or manufacturing and subsequently incorporated into a manufactured product to be sold, the entire unit is taxable. For example, paper pulp and wood fiber, first used in a filtration process, is later incorporated into cattle feed and sold. The purchases of pulp and fiber are taxable. (C.C.H. 60-118.693; Tax Counsel Ruling 3/25/65.) Also, the sale of sulphuric acid, first used as a dehydrating agent, is a retail sale and subject to tax even though it is subsequently incorporated into other tangible personal property which is sold. (C.C.H. 60-118.121; Tax Counsel Ruling 5/26/55.)

It is evident from the record that Kaiser's dominant motive or purpose in purchasing the materials in question was to use them in removing the impurities from its molten steel, a "purpose other than resale." (§ 6007.) Although Kaiser intended to eventually resell the materials in the form of slag, Kaiser first *used* all of the materials in question in a nonexempt manner, thereby determining their taxability. (§ 6012, subd. (a)(1) and § 6094, subd. (a).)[4]

Kaiser suggests that in the manufacturing field, the courts should, as the Board has done, apportion the tax according to uses made of the materials purchased. Indeed, the Board has apportioned the tax in some circumstances, not here applicable. When the purchaser buys a quantity of materials and has two purposes in mind (within the meaning of § 6007), the Board permits apportionment of the tax if the purchaser can establish what portion he is using for the exempt purpose and what portion for the nonexempt purpose. This is so even though the portions will be utilized at the same time. Thus, in the instant case Kaiser had purchased a quantity of aluminum bar and shot and was able to establish that 60 percent was used as an aid in manufacturing and 40 percent was incorporated into the steel.[5] Tax counsel rulings are in accord: "Where

[4]"Use" is defined in section 6009: " 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership of that property, and also includes the possession of, or the exercise of any right or power over, tangible personal property by a lessee under a lease, except that it does not include the sale of that property in the regular course of business."

[5]The parties stipulated and the court found that upon auditing Kaiser's tax returns, the Board accepted Kaiser's claim that "a portion of the aluminum bar and shot is purchased

scrap carbon or graphite is added to the charge in addition to the normal coke charge, and is used solely to add carbon to the iron and is not used as a fuel, the sale of the scrap carbon or graphite would be exempt from tax as a sale for resale. If, however, any portion of such scrap carbon or graphite does in fact oxidize or burn and, therefore, provide heat which aids the manufacturing process, that proportion would be considered as sold for consumption as is the case of the 55% of the coke considered used by Ruling 17." (C.C.H. 60-118.481; Tax Counsel Ruling 7/19/55.) Tax Ruling 17, referred to in the above quoted ruling, has been adopted as regulation 1530. It applies to foundries in general and determines the taxability of coke in terms of proportions utilized for the dual purposes of aid in manufacture and for resale. The industry has apparently been able to establish to the satisfaction of the Board that any purchase of a quantity of coke in that industry is for dual purposes and utilized thus in the proportions provided by the section. Likewise, the fur dressers and dyers have been able to establish that certain dyestuffs and chemicals used by them are for incorporation into skins and furs which they process. The Board has noted, however, that two of the materials (sodium chloride and hydrogen peroxide) are also commonly used for "fleshing" and "bleaching" respectively, and insofar as the furriers give the vendor resale certificates and then "consume" any portion of the materials for fleshing or bleaching, the entire purchase of the material is taxable unless the furrier keeps accurate records showing the respective amounts used for each purpose. (Reg. 1531.)

Apportionment has no place in the instant case because Kaiser did not have dual purposes for the quantities purchased. *All* quantities of the materials which ended up in the slag and are the subject of the instant dispute were purchased for use as an aid in the manufacturing process. ▮ It is settled law that the eventual resale of personal property by a person who purchases such property for use will not prevent the original sale of such property from being a retail sale subject to tax. (§§ 6009, 6094, subd. (a).)

Kaiser cites out-of-state cases which support its position. Since the sales tax schemes in states where those cases arise differ from California's, no purpose is served in reviewing them here.

---

to incorporate it into steel according to customer specifications." The customer wanted a special fine grained quality. We are not here concerned with the 40 percent incorporated into the steel. As noted earlier our issue relates only to the taxation of the materials which became slag.

The primary-purpose test, which we reaffirm in this decision, finds support in tax policy. The test assures that the entire amount of materials will be taxed at its highest value. Permitting an exemption when materials are incorporated into the finished product is rational, since the materials enhance the value of the product which will eventually be sold and taxed at its highest value. Kaiser's position would permit use of materials costing millions of dollars in aid of manufacturing a profitable article, while avoiding taxation in the reselling of a relatively worthless waste byproduct. In other words, instead of materials being taxed at their highest value, they will be taxed at a tiny fraction of that value. Such a result does not comport with the legislative scheme as indicated by the court decisions and administrative interpretations.[6]

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Newman, J., concurred.

---

[6]Since we hold that the Board has uniformly administered the tax provisions in question and that the Board's treatment of Kaiser is consistent with the treatment of taxpayers similarly situated, we do not reach Kaiser's constitutional claim that the Board has discriminated against it in failing to apportion and exempt from tax those materials that became components of the slag.