TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 86-107 |
| of | : | APRIL 30, 1986 |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| RONALD M. WEISKOPF<br>Deputy Attorney General | : | |

_____

THE HONORABLE GERALD J. GEERLINGS, COUNTY COUNSEL, COUNTY OF RIVERSIDE, has requested an opinion on the following question:

Is a 12-year-old Arabian stallion which has never raced and which has sired several foals none of which has ever raced, eligible for the "in-lieu taxation" provided by part 12 of the Revenue and Taxation Code?

CONCLUSION

A 12-year-old Arabian stallion which has never raced and which has sired several foals none of which has ever raced, is nonetheless eligible for in-lieu taxation under part 12 of the Revenue and Taxation Code if he was used for breeding purposes during the previous two calendar years in order to produce progeny that would race. That is a question of fact for the assessor to determine from all the evidence.

1

86-107

ANALYSIS

In 1971 the Legislature determined that subjecting racehorses to California's general property tax was detrimental to the vitality of the State's horse racing industry and resulted in serious tax inequities among owners of racehorses. (Rev. & Tax. Code, § 5701 added by Stats. 1971, ch. 1759, § 8, p. 3798.) Accordingly the Legislature added part 12 to the Revenue and Taxation Code (§ 5701 et seq., hereinafter, "part 12") to provide a special uniform system of "in-lieu taxation" for racehorses throughout the state. (*Id.*, §§ 5701, 5722.) It imposes a considerably lower tax than that which would otherwise be imposed on racehorses. (Compare Cal. Const., art. XIII, §§ 1, 2, 12 and *id.*, art. XIII A with § 5722.) For example, the annual tax on a 12-year-old stallion valued at $1,000,000 now would be $1,000 rather than $10,000 under the 1 percent ad valorem general property tax.

We are asked whether a 12-year-old Arabian stallion which has never raced and which has sired several foals none of which has ever raced, is eligible for the in-lieu taxation under part 12.[1] We conclude it would be if he had been used for breeding purposes in the two calendar years previous to when tax is due, in order to produce progeny that would race.

Section 5721 of the Revenue and Taxation Code[2] provides as follows:

"For the 1973 calendar year and each calendar year thereafter, on the privilege of breeding, training, caring for or racing a racehorse in this state,

_____

[1] The full particulars we are given are that:

a.  The horse is a registered Arabian horse within the scope of Property Tax Rule 1046(b). (Tit. 18, Cal. Admin. Code, 1046, subd. (b); cf. tit. 4, Cal. Admin. Code, 1588.)

b.  He is a stallion within the generic meaning of being an uncastrated male.

c.  He is approximately 12 years old.

d.  He has been used for breeding purposes.

e.  He has serviced three or more different registered broodmares during the two calendar years previous to the year of tax assessment. (Cf. Rev. & Tax. Code, § 5710.)

f.  Since 1972 he has sired more than 160 Arabian horses, none of which have ever been proven to have participated in horse racing, either in California or elsewhere.

g.  He is a recognized championship show horse which has produced substantial revenues to the owner in the form of prizes and trophies.

h.  He has never raced nor have his owners registered with the California Horse Racing Board as owners of race-horses. (But see fn. 12, *post*.)

[2] All unidentified section references are to the Revenue and Taxation Code.

2

there is hereby imposed an annual tax on owners of racehorses for such racehorses domiciled in this state, which shall be in lieu of any property tax on racehorses subject to taxation pursuant to this part."

Section 5722 sets forth the scheduled tax.

The term "racehorse" is defined by section 5703, which definition is controlling for discerning the operation of part 12. (§ 5702; cf. *Rideaux* v. *Togrunson* (1939) 12 Cal.2d 633, 636; *Buchwald* v. *Superior Court* (1967) 254 Cal.App.2d 347, 354.) The section provides:

"'Racehorse' means each live horse, including a stallion, mare, gelding, ridgeling, colt, filly, or foal, that is or will be eligible to participate in or produce foals which will be eligible to participate in a horseracing contest in California wherein parimutuel racing is permitted under rules and regulations prescribed by the California Horse Racing Board. 'Racehorse' does not mean or include any horse over three years old, or four years old in the case of an Arabian horse,[3] that has not participated in a horserace contest on which parimutuel wagering is permitted or has not been used for breeding purposes in order to produce racehorses during the two previous calendar years."

Does our Arabian come within its ambit?

There are two criteria which must be fulfilled to meet the statutory definition of "racehorse" under section 5703. One, a horse must now or in the future

be eligible to participate in or produce foals which will be eligible to participate in a horse racing contest in California wherein parimutuel racing is permitted under rules and regulations prescribed by the California Horse Racing Board

and two, if it is over three years old, or four years old in the case of an Arabian, the horse must either

---

[3] The reference to the four-year-old Arabian was added in 1985 (Stats. 1985, ch. 1250, § 4) upon the Legislature finding that Arabian horses begin racing and breeding at least one year later than other breeds. (*Id.*, § 3, amending 5701, *post* (legislative intent).)

(a) have participated in a horse race contest on which parimutuel wagering is permitted or (b) have *been used for breeding purposes in order to produce racehorses* during the two previous calendar years.

It is the emphasized portion of this second criterion which is troublesome.

The first criterion is innocuous enough. It merely requires that a horse or its foals be "eligible to participate in a horse racing contest wherein parimutuel racing is permitted under the rules and regulations prescribed by the California Horse Racing Board."[4] Those rules and regulations appear in chapter 4 of title 4 of the California Administrative Code (§§ 1400-2050). Under them, for a horse to be "eligible" to "participate in a race" it must, inter alia, be registered with one of five mentioned equine organizations, viz—

the Jockey Club if a thoroughbred, the United States Trotting Association if a standardbred (harness horse), the American Quarter Horse Association if a quarter horse, the Appaloosa Horse Club if an appaloosa, *or the Arabian Horse Registry of America if an Arabian.* (4 Cal. Admin. Code, § 1588, subd. (a);[5] see also Bus. & Prof. Code, sections 19416, 19409, 19413.5,

---

[4] Article IV, section 19, subdivision (b) of the California Constitution authorizes the Legislature to pro- vide for the regulation of horse races in California and wagering on their results. (Cal. Const., art. IV, § 19, subd. (b).) In the Horse Racing Law (Bus. & Prof. Code, div. 8, ch. 4, § 19400 et seq.) the Legislature has: (a) vested the California Horse Racing Board with "[j]urisdiction and supervision over meetings in the State where horse races with wagering on their results are conducted, and over all persons or things having to do with the operation of such meetings . . ." (*id.*, § 19420); (b) has authorized it to "prescribe rules, regulations and conditions . . . under which all horse races with wagering on their results [are] conducted in this State" (*id.*, § 19562); and (c) has defined a type of wagering on horse races known as parimutuel wagering (*id.*, § 19411), declaring it to be the only method of wagering permitted (*id.*, §§ 19593, 19595) and has directed the Horse Racing Board to "adopt rules governing, permitting and regulating [it]." (*Id.*, § 19590.)

[5] Section 1588 provides in full:

"In addition to any other valid ground or reason, a horse is ineligible to start in any race if:

"(a) Such horse is not registered by the Jockey Club if a thoroughbred, the United States Trotting Association if a standardbred (harness horse), the American Quarter Horse Association if a quarter horse, the Appaloosa Horse Club if an appaloosa horse, or the Arabian Horse Registry of America if an arabian horse.

4

19416.5, paragraph 1, 19416.5, paragraph 2, defining the breeds in terms of such registration respectively.)

Since Arabians are thus currently recognized as a breed that is "eligible," i.e., fit or qualified to be chosen or used (Webster's Third New Internat. Dict. (1971 ed.) at 736) in horse racing contests wherein parimutuel racing is permitted under the rules of the California Horse Racing Board, an Arabian which is or will be registered with the Arabian Registry of America, Inc. would qualify on that count as being a "racehorse" within the meaning of section 5703 for the purpose of the in-lieu taxation established by part 12.[6]  We are told that the Arabian in question has been so registered.  (See fn. 1, § 1, *ante*.)

---

"(b) Unless the stewards permit otherwise, the certificate of foal registration, eligibility papers, or other registration issued by the official registry for such horse is not on file with the racing secretary at the time of entry;

"(c) Such horse has been entered or raced at any recognized race meeting under any name or designation other than the name or designation duly assigned by and registered with the official registry;

"(d) The certificate of foal registration, eligibility papers or other registration issued by the official registry has been altered, erased, or forged:

"(e) The identification markings of the horse do not agree with the identification markings as set forth in the registration of such horse.

"(f) Unless he is eligible to enter said race and is duly entered for such race.

"(g) When such horse is owned in whole or in part by an unlicensed person or is in the care of an unlicensed trainer.

"(h) When such horse is on the Steward's List, the Starter's List or the Veterinarian's List.

"(i) When, except with prior approval of the stewards, such horse has not been on the grounds of the association or its approved auxiliary stable area for at least 24 hours prior to the time the race is to be run."

[6] Before the 1974 lien year, Arabians did not qualify as racehorses under section 5703 of the Revenue and Taxation Code, although the racing of the breed, especially at fairs, had been recognized and encouraged.  (See, e.g., Bus. & Prof. Code, §§ 19416.5, 19517.5, 19543, 19566.)  Still, when part 12 of the Revenue and Taxation Code was adopted in 1971 they had not been "recognized" by the California Horse Racing Board as being a breed that could be eligible to participate in general parimutuel racing and section 1588 did not list them or their registry as a possibility.  On August 4, 1973, however, the Board recognized Arabian racing by amending section 1588 to provide, that an Arabian registered with the Arabian Registry of America is otherwise eligible to race.  The next year the State Board of Equalization amended its rule 1046 to reflect that development.  (Tit. 18, Cal. Admin. Code, § 1046, subd. (b): "In order to qualify as a racehorse [for in lieu taxation] a horse must be registered or eligible to be registered with . . . [inter alia] The Arabian Horse Registry of America.")  Section 19566.5 of the Business and

5

But the 12-year-old Arabian in question has never raced and that brings the troublesome second part of the statutory definition of "racehorse" into play. It states as a negative what does *not* constitute a racehorse for part 12 purposes: a horse over three years old or four years old in the case of an Arabian horse, that has *not* participated in a horse race contest on which parimutuel wagering is permitted or has *not* been used for breeding purposes in order to pro- duce racehorses during the two previous calendar years. (§ 5703.) We have taken the inverse of the statement to posit a positive second criterion for the statutory definition: to be considered a racehorse within the meaning of section 5703 a four-year-old Arabian must either (a) have participated in a horse race contest on which parimutuel wagering was permitted *or* (b) have been used for breeding purposes in order to produce racehorses during the two previous calendar years. (Cf. *Hogue* v. *Ford* (1955) 44 Cal.2d 706, 712 ("or").) Since the 12-year-old Arabian has never raced, for him to be eligible for in-lieu tax treatment under part 12, he must meet the second alternative of the condition, to wit, he would have had to have been used "for breeding purposes *in order to produce racehorses* during the two previous calendar years." Thus, this much is clear from the statute itself: unless the emphasized words are merely surplusage -- a possibility we must reject (*California Mfgrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844; *Fields* v. *Eu* (1976) 18 Cal.3d 322, 328), the breeder of our Arabian can qualify for part 12 in-lieu tax treatment only if he can demonstrate that the purpose of breeding the stallion was *to produce racehorses*.

But what does that mean?[7] In other words, what is the meaning of "racehorse" as the word is now used at the end of the statutory definition? Is its meaning

---

Professions Code provides that "The Stud Book of the Arabian Horse Registry of America, Inc. shall be recognized as the sole official registry for Arabian horses."

There are, of course, other criteria determining whether a particular horse is eligible to race that are set forth in the Rules of the Horse Racing Board. However, they are less predictable in that they deal with the specific situation of a particular horse rather than the generality of a whole breed. (See, e.g., tit. 4, Cal. Admin. Code, § 1588, subds. (b)-(i), fn. 5, *ante*.) The State Board of Equalization has focused on registerability and made *it* the sole determinant for eligibility vis-a-vis section 5703. (Tit. 18, Cal. Admin. Code, 1040, subd. (a), *supra*.)

[7] The implementing regulation of the Board of Equalization (tit. 18, Cal. Admin. Code, § 1046) invites the same question. It provides:

"A horse over three years of age that, in the two previous calendar years, has neither participated in a horserace contest on which parimutuel wagering is permitted nor been *used for breeding purposes in order to produce a racehorse eligible to participate in a horserace contest on which parimutuel wagering is permitted is not a racehorse* within the meaning of part 12 of division 1 of the Revenue and Taxation Code. Any such horse is subject to ad valorem taxation unless otherwise exempt.

6

there, as has been suggested, the same as is given in the first sentence, in which event we would merely round the track of section 5703 to return to its starting gate of broadly defining "racehorse" as any appropriately registered equine whether or not it was ever the owner's intention to have it or its progeny race.[8] Or does the term have a narrower meaning at the section's finish than at its start and, if so, what would it be?

Ordinarily one does not expect to find different meanings for the same word used different times in the same section of law, for that would, as it were, ascribe an intent to the Legislature to change horses in midstream. (Cf. *Rosemary Properties, Inc.* v. *McColgan* (1947) 29 Cal.2d 677, 686.) But that rule is not absolute (cf. *Sunset Tel. and Tel. Co.* v. *Pasadena* (1911) 161 Cal. 265, 275; *Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 95) and we believe we have an exception to it here.

Section 5703 is a definitional section consisting of two parts. The first part appears as its first sentence which defines the term "racehorse" in terms of an eligibility to participate in a parimutuel race. That, as we have seen, essentially means that a horse must merely be of a registerable breed and appropriately registered. (See fn. 6, *ante*, & accompanying text.) The second part of the definition appears as its second sentence and in effect is an exclusion of certain horses from those that would otherwise be covered by the first part.[9] An exclusion perforce must be less inclusive than the whole which it

---

"(a) A horse used for breeding purposes means a registered male animal that has serviced three or more registered females *for the purpose of producing a racehorse* during the two previous calendar years or a registered female animal that has been bred to a registered male *for the purpose of producing a racehorse* during the two previous calendar years." (Emphases added.)

So does section 5710 of the code, which defines "stallion" as "any racehorse which, during the two previous calendar years, has serviced three or more different broodmares for the purpose of producing a racehorse." (§ 5710.) A "broodmare" is essentially defined as "a racehorse mare." (Compare § 5711 ("producing broodmare") with § 5712 ("nonproducing broodmare").

[8] We are told that unlike the quarterhorse, saddle- horse and appaloosa registries, the Arabian registry is closed -- i.e., only those horses whose sires and dams were registered Arabians may be registered. We are also told that there were 46,919 Arabian horses in California in 1984 and that only 125 raced in California tracks in that year of which 20 to 25 percent were California horses. The self-closing interpretation of section 5703 would give *all* arabians the special in-lieu tax advantage.

[9] Originally it was separately stated as such. when part 12 was first enacted in 1971 the two sentences (parts) comprising of the definition of racehorse that now appears as section 5703 appeared in separate sections. The first sentence appeared as it does today in section 5703 in chapter 1 of the law entitled General Provisions and Definitions. (Stats. 1971, ch. 1759, § 8, p. 3799.) The second sentence was set forth in an independent section, 5742, which was contained in chapter 3 of the law entitled "Exclusions." It read:

7

modifies (cf. *City of National City* v. *Fritz* (1949) 33 Cal.2d 635, 636) and must be narrowly construed. (*Ibid.*; *Marrujo* v. *Hunt* (1972) 71 Cal.App.3d 972, 977.) Unfortunately the exclusion here is cast in crucial aspect with the very term it seeks to help define, thus inviting circularity and presenting the problem. Nevertheless, that the meaning of "racehorse" as it is used at the end of the exclusion part of section 5703 was meant to be less inclusive than its use at the beginning of the section is manifest from the Legislature's declared overall intention for enacting part 12.

Section 5701 sets that forth as follows:

"The Legislature finds that subjecting race- horses to the general property tax has resulted in a serious lack of uniformity as between one county and another respecting the method used in arriving at an assessed value; that this has resulted in serious inequities between the owners of racehorses depending in part on the county wherein they are assessed; that a continuation of current assessment practices *will result in a substantial decrease in the breeding, boarding, and training of racehorses for racing competition in California* and that cur- rent assessment practices have caused racehorse owners to remove their horses from California to other major breeding states with the result that over a period of time if these assessment practices are continued, both the breeding and racing of racehorses in California will suffer in that the quality and quantity of racehorses will be reduced and impaired; that a severe loss of employment and taxes to breeding and racing will result, attendance at race meetings will decrease, and betting will be reduced with consequent substantial loss of revenue to California. It is the intent of the Legislature, in enacting this part, to establish a more equitable method of taxing racehorses and thereby provide incentives to owners of these horses to maintain their horses within the state by providing for a uniform system of in-lieu taxation for the racehorses subject to the provisions of this part. The Legislature further

---

"5742. A racehorse that does not participate in a horserace contest on which parimutuel wagering is permitted within two consecutive previous tax years and is not used for breeding purposes in order to produce racehorses shall not be considered a racehorse *under the provisions of this part*." (Stats. 1971, ch. 1759, § 8, p. 3810; emphasis added.)

In 1972 the Legislature revised part 12 essentially to change the reporting period from a fiscal year to a calendar year basis. (Stats. 1972, ch. 665, 45, p. 1232.) (The age of a horse is so reckoned. (Tit. 4, Cal. Admin. Code, § 1420(c).) Section 5742 was repealed at that time (Stats. 1972, ch. 665, § 32, p. 1229) and its essence transferred to section 5703 (Stats. 1972, ch. 665, § 8, p. 1226).

8

finds that, because Arabian horses begin racing and breeding at least one year later than other breeds, Arabian horses should be treated equitably by allowing that breed four years before they are required to begin racing or be engaged in breeding activities." (§ 5701; emphases added.)

The section we can see evinced a legislative concern that the horse *racing* industry in California would suffer if a uniform in-lieu system of lesser taxation were not adopted to promote it. The Legislature was not concerned with breeding of horses for show or any other purpose. Rather, its efforts were directed to creating a favorable tax-climate for the "breeding . . . and training of racehorses *for racing competition* . . ." (§ 5701; emphasis added) and we believe this is what is reflected in section 5703's exclusion from part 12 favorable tax treatment, those racehorses which "[have] not been used for breeding purposes *in order to produce racehorses* during the two previous calendar years." (§ 5703, emphasis added.) "Incentives" would be given, not to owners of *all* racehorses, but only to those of certain "racehorses subject to the provisions of part [12]." (§ 5701; cf. § 5768: "*racehorses of a type* subject to the provisions of this part. . . .") As we interpret the limitation found in section 5703, for an owner to be eligible for that in-lieu taxation under part 12 he or she would have to demonstrate that his or her registered three-year-old, or four-year-old in the case of an Arabian, which had not participated in a parimutuel contest, had truly been bred during the previous two calendar years in order to produce horses that were expected to race.

The Legislature has established January 1st of each calendar year as the time when the tax imposed pursuant to part 12 is *determined* and due. (§ 5761.)[10] Section 5722 sets forth the schedule of tax due depending upon a racehorse's classification and the owner of a horse reports the applicable tax on forms provided by the county assessor. (§ 5782.) The amount imposed varies and covers: "Stallions" according to "Stud fee classification" (highest amount imposed being $1,000, lowest $50); "Broodmares" from stakes-winning and producing ($75) to nonproducing broodmares ($12); active racehorses according to their past year's earnings (highest amount imposed being $150, lowest $40); and other racehorses such as stakes three-year-

---

[10] Section 5761 provides: "The tax imposed pursuant to this part shall be determined as of 12:01 a.m. January 1 of the calendar year for which it is imposed and shall be immediately due and payable to the tax collector of the county in which the racehorse is domiciled." The tax due becomes delinquent at 5 p.m. on the 15th day of February of the calendar year for which it is imposed (§ 5762) with a 6 percent penalty attaching then and an additional 1 percent on the first day of every calendar month thereafter until the delinquent tax and penalties have been paid in full. (§ 5763.) Failure to file a report by the delinquent date carries an additional penalty of 10 percent (§ 5767); filing a false or fraudulent report with an intent to defeat or evade the in-lieu tax, an additional 25 percent. (*Ibid.*)

9

olds ($35) and nonactive racehorses ($20). (§ 5722; see *Pesola* v. *City of Los Angeles* (1975) 54 Cal.App.3d 479, 482.)

We believe the Legislature contemplated that there would be a singularity of owner's purpose for breeding his or her horse which could be, and was to be, *determined as of the time the horse was bred*.[11] Again, for a horse that has not raced to be eligible for in-lieu taxation under part 12, that purpose would have to be the desire to produce horses that would someday race. We reject the notion that an owner would also have to show that the progeny actually did race. There is nothing in the legislative history to indicate that that narrow a construction was ever intended, and surely the Legislature could have added a qualification to section 5703 to so narrow the field -- e.g., "used for breeding purposes in order to produce racehorses [*which have actually raced*] during the two previous calendar years" or "used for breeding purposes [which have produced horses which have actually raced] . . . ." (Compare § 5711.) Even if we could add such a qualification under the guise of statutory construction (but see *Vallerga* v. *Dept. of Alcoholic Bev. Control* (1959) 53 Cal.2d 313, 318; *Rowan* v. *City of San Francisco* (1966) 244 Cal.App.2d 308, 314) it would not work in the present statutory scheme. Inasmuch as most horses do not participate in parimutuel races before their third year, a requirement that a horse's progeny must actually have raced for the parent to qualify for favorable tax treatment would not square with the two-year time period spoken of in section 5703 to reckon the tax determined every January 1 on the sire or dam. (Cf. § 5761.) The periods for calculation simply would not mesh.

In addition, so narrow a construction would not realistically serve the statutory purpose of promoting a viable horseracing industry in this state. When one breeds horses to produce racers, one has expectations that the progeny will actually race. But it is said that the biggest gamble in horse racing is the breeding: we are told for example that of the 25,000 to 30,000 thoroughbreds foaled yearly in California, only some 6,000 ever make it to a starting gate. Needless to say it would not serve to encourage the state's racing situation if favorable tax treatment were denied owners who actually have bred their horses for the purpose of producing horses that would race when

---

[11] In other endeavors where one's purpose is the determinant of tax consequence, as for example whether a sale will be taxed as a retail sale (§§ 6007, 6051, 4 Cal. Admin. Code, § 1525(a)(b), "the California courts have consistently looked to the *primary intent* of the purchaser or the *primary purpose* of the purchase." (*Kaiser Steel Corp.* v. *State Board of Equalization* (1979) 24 Cal.3d 188, 192.) Such presupposes however that an undertaking admits multiple purposes which we understand not to be the case with the breeding horses to produce issue that would race. To the extent however that at the time of such breeding more than one purpose may be possible, section 5703 would demand that the desire to produce progeny that would race be the primary or dominant purpose.

10

it turns out for one reason or other that the progeny could or did not. (See e.g., *Smithsonian*, Vol. 17, No. 1 (April 1986) 116, 124.) The legislative purpose for enacting part 12 cannot be played against those averages of disappointed expectations. Moreover, to predicate eligibility for in-lieu taxation on the subsequent occurrence of whether a horse's foals have actually raced would be particularly unfair to the owners of stallions. Given that a foal usually remains with the mare after foaling and is owned by her owner, not only would such a demand impose a particularly onerous burden on the owner of a stallion which has sired many foals to keep track of their development after servicing in order to establish his tax status, but it would also make that status dependent on the doings of another, to wit, the owner of the mare who controls the foal.

We therefore conclude that for part 12 purposes it is the intent of a horse owner *at the time of breeding* that determines whether a horse will be eligible for the favor- able in-lieu tax. If the owner's purpose at that time was to breed the horse to produce progeny that would race, it would be eligible and a later disappointment of the owner's expectations or a different happenstance use of the foal is irrelevant.

Based essentially on the adage that "the pedigree proves the horse," there are objective criteria by which the intention or purpose of an owner for breeding his/her horse can be determined. One would look to the background of both the owner and the horse, as for example—

> Is the horse's family line noted for having produced horses which have actually raced? Has the subject horse itself ever produced earlier progeny which have raced? Does the owner's advertising for stud services or syndication sales stress racing heritage and racing desirability, or does it stress instead halter performance, showability and show records?

> Are the subject horse and its earlier progeny placed on farms specializing in race training (e.g., ones complete with track and starting gates) or do the farms specialize instead in conditioning and lay-up? What type of training is provided the horse?

> Is the owner active in the racehorse industry and in the various racing associations (e.g., the Arabian Racing Association of California which breeds arabians for racing)? What is his or her history for breeding horses which have raced?

11

Does the owner have any of the required licenses to take part in horseracing contests[12] What does his recordkeeping and tax reporting indicate regarding the purpose of his/her breeding activities (e.g., racehorses are depreciated on a three-year life, other horses over five years)?[13]

While divining "purpose" usually involves probing subjectivity, and "intent" is a fact only its possessor can know with certainty, determinations about them can be made by others on objective manifestations, albeit circumstantial evidence. We have offered the foregoing as some examples of objective factors that can be used to determine whether a horse owner had bred his or her horse in order to produce progeny that were expected to race.

Accordingly, in answer to the question posed herein we conclude that whether the subject Arabian would be eligible for part 12 in-lieu taxation as a "racehorse" would depend on whether he had been used for breeding on the expectation that his issue would someday race. Whether a particular horse was used for breeding with the expectation that the issue would someday race is a question of fact for the assessor to determine from the evidence.

*****

---

[12] Breeders of horses do not have to be licensed by the California Horse Racing Board for that endeavor. However, for a horse to actually race, its owner must be licensed. (See, e.g., tit. 4, Cal. Admin. Code, §§ 1420(n), 1505, 1588(g); cf. *id.*, § 1895.)

[13] The in-lieu tax imposed by part 12 may be imposed at any time within five years after the tax would have otherwise become due. (§ 5766.) Section 5768 requires owners to keep "business records relevant to the number and type of racehorse located in any county of the state during any taxable period. . . . for a period of five years from the date any tax to which they relate becomes due." (§ 5708.) The owners, we remember, are required to report tax due under part 12 by February 15th of the calendar year for which it is imposed. (§ 5782; cf. §§ 5761, 5762, see fn. 10 & accompanying text.) A county assessor may demand substantiation of reported claims: Section 5768 provides that upon an assessor's request "an owner of racehorses of a type subject to [part 12 taxation] shall make available . . . a true copy of [his] business records relevant to the number and type of racehorses located in [the] county. . . ." Section 5765 provides that the assessor "may perform audits of the books and records . . . to determine if the correct information has been reported and the proper amount of tax has been paid." (§ 5765, subd. (a).)

12