[Civ. No. 49983. Second Dist., Div. One. May 24, 1978.]

LOCKHEED AIRCRAFT CORPORATION,
Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

[Civ. No. 49982. Second Dist., Div. One. May 24, 1978.]

AEROJET-GENERAL CORPORATION, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

258

## COUNSEL

Evelle J. Younger, Attorney General, and Neal J. Gobar, Deputy Attorney General, for Defendant and Appellant.

Hill, Farrer & Burrill, Carl A. Stutsman, Vincent C. Page and Rex W. Kellough for Plaintiffs and Respondents.

## OPINION

**HANSON, J.**—The State Board of Equalization of the State of California (hereinafter referred to as the Board) appeals from judgments favoring the taxpayers in two separate suits for refund of sales and use taxes paid brought by Lockheed Aircraft Corporation (hereinafter referred to as Lockheed) and Aerojet-General Corporation on behalf of itself and its predecessor in interest, Space General (hereinafter referred to collectively as Aerojet), respectively (hereinafter sometimes collectively referred to as taxpayers).

### PROCEDURAL POSTURE

The Board, after conducting its regular audits of the records of the taxpayers, in 1964 issued notices of determination of taxes due for the calendar years of 1960 through 1962 for Lockheed and in 1966 issued

similar notices as to taxes due for 1963 through the first quarter of 1966 for Aerojet.[1] The taxpayers in both cases petitioned for redetermination, obtained hearings, which in Lockheed's case resulted in certain adjustments, and ultimately paid the redetermined tax and interest. Thereafter each filed its claim for refund, Lockheed claiming the amount of $18,347.45 and Aerojet claiming a total amount of $31,468.89, which was denied by the Board.

The taxpayers exhausted their administrative remedies and filed these actions in the superior court to recover the sales and/or use taxes paid on the test equipment manufactured or purchased by them and stored on their premises pursuant to defense contracts with the United States government.

The trial court was presented with and based its decision upon a stipulated statement of facts, supporting exhibits, and the depositions of Bruce Holloman, tax specialist for Lockheed, and Harry A. Say, sales tax administrator, and Ed Stetson, tax counsel, for the Board during the relevant periods. The Board waived findings of fact.

The superior court rendered judgment in favor of taxpayers and the Board appeals.

The focal issue is the application of the sales and use tax law to various items of "special test equipment" acquired by Lockheed pursuant to its contract to produce aircraft and supporting equipment and by Aerojet to produce torpedoes and supporting equipment under defense contracts with the federal government.

The Board in performing its audit and imposing the tax relied upon its Sales Tax General Bulletin 57-22 entitled "Application of Tax to Special Tooling," which reflected an attempt by the Board to apply its tax to certain items customarily characterized as "special tooling." There is no question concerning the measure of the tax; the issue revolves solely around the taxability of the "test equipment" as a category previously subsumed under "special tooling" which was not subject to sales or use tax by the state.

---

[1]The facts and circumstances relating to the determination of tax by the Board as to Lockheed and Aerojet were in each case substantially similar, varying merely in details not relevant to the determination of the legal issues (such as specification of the parties, the specific contracts and amounts claimed to be due by the state, and the time periods involved).

## STIPULATED FACTS

### A. BACKGROUND

In the case at bench, all of the test equipment was acquired or manufactured for the purpose of conducting functional tests by Lockheed of aircraft, aircraft subsystems, or components and the testing by Aerojet of torpedoes, torpedo launching and firing systems and various related items. The special test equipment which is the subject of the disputed tax was acquired or manufactured by Lockheed in the performance of nine separate defense contracts with the federal government, and by Aerojet under two different federal government prime contracts and one subcontract (hereinafter referred to collectively as contracts). Although numerous types of contractual relationships were represented by the various contract forms in use during the period, those with which we are here concerned were characterized by the Armed Services Procurement Regulations (ASPR) as fixed-price type contracts.

### B. THE CONTRACTS AND MODE OF PERFORMANCE

*Special Tooling Clause:*

The contracts contemplated that testing of performance would be required and that "special test equipment" would be necessary for this purpose. The respective contractors were required to conduct "functional tests" of the end products and component systems in order to assure that they conformed with prescribed design and performance specifications and for this purpose the taxpayers were to acquire or manufacture special test equipment. The term "special test equipment" is used to refer to that test equipment acquired or manufactured by the contractor which is related to, designed for and utilized in the fulfillment of one particular contract with the federal government, and which is of such specialized nature that its use is limited. It may or may not have characteristics rendering its application to other projects of the company or the federal government feasible. The same use of the term "special" is made in describing tooling. Thus "special tooling" refers to those items such as dies, jigs and the like designed for and used to complete a specific contract. It is customarily sufficiently unique that use or application to the fulfillment of another and different contract, in the absence of substantial modification, is unlikely.

Each of the contracts defined the term "special tooling" in language substantially similar as follows: "The term 'special tooling,' as used in this clause, means all jigs, dies, fixtures, molds, patterns, special taps, special gauges, *special test equipment,* [2] other special equipment and manufacturing aids, and replacements thereof, acquired or manufactured by the Contractor for use in the performance of this contract, which are of such a specialized nature that, without substantial modification or alteration, their use is limited to the production of such supplies or parts thereof, or the performance of such services, as are peculiar to the needs of the Government." (Italics added.) In each of the present contracts the test equipment was uniquely designed for and was in fact used successively during the manufacturing process in testing the performance of the military aircraft, torpedoes, receiver assemblies and other items which constituted the end products. The testing was conducted by Lockheed and Aerojet, respectively, both during and after the manufacturing process. The test equipment, though composed in part of stock items such as tubes and transistors, and other materials, once fabricated and assembled had no useful commercial application.

The "special tooling" clause further provides, inter alia, that contractor (Lockheed or Aerojet) is not to use any of the special tooling except in performing the contract and requires the contractor to maintain property control records, to identify the tooling as property of the federal government by appropriate stamp tag or mark, and when the contract is completed or the tooling items are no longer needed for performance, to notify the federal government submitting lists of the tooling and the applications for which it was designed. If the contractor desires to retain any of the tooling, it may make an *offer* to purchase it at a price no less than its fair value which the federal government may accept or reject. In the event the tooling is not purchased by the contractor, the federal government has authority to instruct the contractor what disposition is to be made of the tooling; it may direct shipment in accordance with instructions, or preparation for storage or sale for scrap. If the contractor's offer to purchase is accepted or the tooling is sold to third persons or as scrap, the clauses provide that the proceeds will be deducted from the

---

[2]Special test equipment was sometimes further defined in substantially similar language in each contract as follows: "Special test equipment means electrical, electronic, hydraulic, pneumatic, mechanical or other items or assemblies of equipment, which are of such a specialized nature that, without modification or alteration, the use of such items (if they are to be used separately) or assemblies is limited to testing in the development or production of particular supplies or parts thereof, or in the performance of particular services."

amounts due the contractor or will be otherwise paid as the representative of the federal government may direct.[3]

*Title:*

With respect to the special tooling (contractually defined to include special test equipment) the only additional clauses of the contract which have relevance to the legal issues herein presented relate to acquisition of title. The contracts further provide that title to the special test equipment acquired or manufactured for purposes of fulfilling the contracts should pass to the federal government at the time and in the manner there described. In effect under each of the title clauses the federal government takes legal title and enjoys the right to control the special test equipment as soon as such equipment is ready for use under the contracts, whether it is purchased by the taxpayers or fabricated by them. Two different versions of the "Progress Payments" clause, which control passage of title, are used in the several contracts. The only significant distinction between these clauses concerns the time when title to the special tooling (and test equipment) first acquired or produced under the contract passes to the federal government. The first clause[4] provides that title passes when the initial progress payment is made, while under the second clause[5] if any special tooling allocable to the contract was acquired prior to the contract date, title to such tooling would pass immediately on that date.

Under both clauses title to property acquired, produced or allocated to the contract vests in the federal government. All special test equipment acquired or manufactured by the taxpayers under the contracts herein referred to is expressly covered by the special tooling clauses in the contracts. In each case use of the test equipment was limited to the performance of the contract and its cost was paid by the federal

---

[3]The modified provisions of the special tooling clause adopted in 1964 and incorporated in one of the Aerojet contracts differs in ways not here significant.

[4]"*When any progress payment is made under this contract,* title to all parts; materials; inventories; work in process; special tooling as defined in the clause of this contract entitled 'Special Tooling' . . . theretofore acquired or produced by the Contractor and allocated or properly chargeable to this contract . . . shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract. . . shall forthwith vest in the government upon said acquisition, production or allocation." (Italics added.)

[5]"*Immediately, upon the date of this contract,* title to all parts; materials; inventories; work in process; special tooling as defined in the clause of this contract entitled 'Special Tooling' . . . theretofore acquired or produced by the Contractor . . . shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocated or properly chargeable to this contract . . . shall forthwith vest in the Government upon said acquisition, production or allocation." (Italics added.)

government. Accordingly, the taxpayers in purchasing such equipment or parts and materials to be used in fabrication thereof furnished resale certificates to all sellers and suppliers. Moreover, title to all items of special test equipment vested in the federal government before any of the tests of performance were conducted under the various contracts. It was stipulated that all of the work under the various contracts had been completed at time of trial and the parties thereto had complied fully with all procedures and requirements set forth relating to special tooling. Appropriate instructions for disposition of the special test equipment under each contract were provided by the federal government and the taxpayers in each instance followed these instructions.[6]

## ISSUE

The broad issue presented by these consolidated cases is whether the State of California, through its sale and use tax laws administered by the Board, can validly tax the special test equipment manufactured or purchased by Lockheed and Aerojet and used in the performance of their obligations under defense contracts with the federal government, even though legal title and the right to control such equipment passed as soon as it was ready for use to the United States.

In resolving the above issue we address the following questions: (1) Is the special tooling taxable under the general provisions of the Sales and Use Tax Law? (2) Is Sales Tax Bulletin 57-22 which purports to segregate, inter alia, special test equipment from the general category of special tooling in order to render it taxable under the Sales and Use Tax Law valid and enforceable against the taxpayers? and (3) If neither of the foregoing, then is the tangible personal property purchased by the taxpayers with resale certificates subject to taxation under Revenue and Taxation Code section 6244?

[6]Certain items were allocated to and stored for the United States Navy under an agreement requiring Lockheed to provide storage, maintenance and protection for the government-owned property; other equipment was transferred to another government defense contract or to various naval facilities; some equipment was sold as scrap. Aerojet made no use of the test equipment for any purpose other than the completion of defense contracts with the federal government. Some of the Lockheed test equipment was thereafter used in production contracts with Italy and West Germany authorized by the federal government. None of the equipment was purchased by the taxpayers or used by either Lockheed or Aerojet for research and development or commercial application. When test equipment was transferred on instructions of the federal government for use in subsequent production contracts, no part of the cost of any test equipment transferred to such defense contracts with the federal government was charged against such subsequent contracts.

### DISCUSSION

### I

We first consider the reasons that special test equipment, as an item customarily subsumed under the category of special tooling clauses in defense contracts with the federal government, has been exempt from California's Sales and Use Tax Law.

Revenue and Taxation Code section 6051[7] imposes a sales tax, computed as a percentage of gross receipts, upon all retailers for the privilege of selling tangible personal property at retail. Sale is defined by section 6006 as (a) "Any transfer of title or possession . . . of tangible personal property for a consideration" and (f) "A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated, or printed to the special order of the customer . . . ." Section 6007 defines a retail sale as a sale for any purpose other than resale in the regular course of business. Section 6381, however, exempts from the computation of the tax gross receipts from the sale of any tangible personal property to the United States. As a consequence, with respect to any tax on the sale of special tooling or test equipment to Lockheed and Aerojet, their suppliers rather than the plaintiff-appellant corporations would be liable for the tax; however, their suppliers are exempt from such liability by virtue of resale certificates supplied them by Lockheed and Aerojet. It is abundantly clear that pursuant to these statutes special tooling and test equipment purchased for resale or fabricated by Lockheed and Aerojet and sold to the United States pursuant to defense contracts would be exempt from sales tax.

The statutes provide as an alternative basis for taxation, an excise use tax on property purchased for a purpose other than resale in the regular course of business. Section 6201 imposed an excise tax "on the *storage, use or other consumption* in this state of tangible personal property purchased from any retailer . . . ." (Italics added.) Section 6008 defines storage as including the "keeping or retention in this State for any purpose *except sale in the regular course of business* . . . of tangible personal property purchased from a retailer." (Italics added.) Use is defined by section 6009 as including "the exercise of any right or power

---

[7]Unless otherwise indicated, all statutory references are to the Revenue and Taxation Code.

over tangible personal property incident to the ownership of that property . .. except that it does *not* include the *sale of that property in the regular course of business.*" (Italics added.) No definition is provided within the statutory scheme for "consumption." The difficulty in applying the use tax arises because the federal government was the recipient of legal title to the property under the terms of the contracts, and any use of the equipment made by Lockheed and Aerojet in performing defense contracts of the variety herein represented was made on behalf of the United States.

To bring the transactions in the cases before the court within the statutory ambit it was essential that Lockheed and Aerojet possessed the special test equipment for a purpose other than the resale in the regular course of business to the federal government, which is exempt. The Board contends that no real sale (or resale) of the special test equipment occurred at all since the federal government took a mere legal title and Lockheed and Aerojet retained the essential indicia of ownership, such as possession, use, and risk of loss. The code, however, defines a sale as any transfer of "title *or* possession" (§ 6006, italics added) and it thus appears that a sale is contemplated even when something less than all indicia of ownership are transferred.

There can be no doubt that the test equipment became, pursuant to the contract provisions, property of the federal government, and that the government's right to direct the use and subsequent disposition of the property rendered its interest tantamount to full and complete ownership rather than bare legal title (*Douglas Aircraft Co.* v. *Byram* (1943) 57 Cal.App.2d 311, 316-317 [134 P.2d 15]). Contract clauses considered in *General Dynamics Corp.* v. *County of L. A.* (1958) 51 Cal.2d 59 [330 P.2d 794], and *Douglas Aircraft Co.* v. *Byram, supra,* were similar to those in issue here. The California Supreme Court recognized that the Legislature could constitutionally impose a tax on privately held limited interests in government-owned personal property and further concluded that the Legislature has not done so, but has instead followed a consistent pattern of taxing tangible personal property as an entity or not at all. (*General Dynamics Corp.* v. *County of L. A., supra.*) "To be valid a use or possession tax would have to apply to all tax exempt property so as not to discriminate against the private use or possession of property owned by the United States, and it is for the Legislature, not the court, to determine whether such a nondiscriminatory tax on possessory interests in tax exempt personal property should be adopted and to determine the

measure of such a tax." (*Id.,* at p. 67.) The court in both of the foregoing decisions found the federal government's ownership of personal property acquired and possessed by the taxpayer corporations for defense contract use to be substantial and that the contractors' use of government property was for the benefit of the United States. (*Id.,* at pp. 67-70; *Douglas Aircraft Co.* v. *Byram, supra,* 57 Cal.App.2d 311, 315-316.)

The stipulated facts in the present cases describe in detail the contractual provisions for ownership, possession and control of the special test equipment and other tooling both during and after the life of the contract. The federal government acquired title to the special test equipment at the time it was purchased or manufactured and ready for use under each of the contracts. The federal government was entitled to remove the equipment at any time during the contract, and after completion of the contract the federal government could direct its further use or sale. The federal government of course did not exercise its option to remove the equipment during the contracts since that would have frustrated the contractual purposes. Nonetheless, the federal government did instruct Lockheed and Aerojet in the disposition of the test equipment after the termination of performance under the contracts. Some test equipment was sold for scrap and the proceeds credited to the federal government; some equipment was stored; some equipment is being used on contracts with "friendly nations" without charge by Lockheed for such use in the manufacture of the same end products.[8] All of these circumstances are consistent with a bona fide sale of the test equipment to the federal government of equipment for which the federal government has paid in full.

In summary the tax is restricted in its operation to the sale or use of property sold at the retail level. The statute taxing the retail sale of property excludes a sale for resale (§ 6007) and this is the category within which the Lockheed and Aerojet transactions clearly fall. A taxable "use" of property excludes holding the property for resale of the property in the regular course of business (§ 6009; *Chicago Bridge & Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162 [119 P.2d 945]; *Union Oil Co.* v. *State Bd. of Equal.* (1963) 60 Cal.2d 441 [34 Cal.Rptr. 872, 386 P.2d 496]). Since the transactions fall within the regular course of business for Lockheed and Aerojet, their business being the performance of the contracts herein, the resale to the federal government is a retail sale which is exempt under California's Sales and Use Tax Law, unless some distinguishing charac-

---

[8]See footnote 6, *ante,* page 264.

teristic of test equipment appears to exclude it from the treatment generally accorded special tooling.

## II

The Board contends that Bulletin 57-22 is a reasonable and valid exercise of its administrative discretion in interpreting and applying the state's sales and use tax laws in an area where the statutes "interpreted in their intended broad application" impose a tax. Bulletin 57-22 was issued by the Board in an apparent effort to rectify the legislative oversight in failing to tax as "use" a possessory interest in personal property.

In our review of the record we are cognizant of the fact that the character of the relationships between corporations engaged in defense production work and the federal government have given rise to unique problems, especially with respect to state taxation. For one thing, the federal government is the sole entity to whom defense contractors are likely to be able to sell their products, and the products must meet the special requirements of the federal government. Accordingly, it is typical for defense contractors to attempt to pass on to the federal government all costs related to a particular project or contract since the specialized equipment which results from their research and design is unlikely to have application to other contracts, hence their investment cannot be spread out over other projects. Conversely the federal government, since it is underwriting the full costs of the project, provides expressly in its contracts that it is to receive title and control of everything related to the project. The federal government has an interest in acquiring the unique equipment if the contracting corporation defaults. Furthermore, the federal government desires to assure that it will be able to use the special equipment in future contracts without giving a competitive edge to the same contractor. Thus, the contracts in the present case provide, similarly in each case, for federal government ownership of "special tooling," including test equipment, acquired or manufactured by the contractor, "which are of such a specialized nature that, without substantial modification or alteration, their use is limited to the production of such supplies or parts thereof, or the performance of such services, as are peculiar to the needs of the Government."

The Board has apparently over the years perceived the potential for abuse of the state tax laws in the contractual agreements relating to special tooling. Although the Board is not authorized to tax transactions

in which property is sold at retail to the federal government, it has attempted to find a means to tax property used in connection with defense contracts even if that means the contract price to the federal government will be increased. In the Board's view the defense contractor which acquires or manufactures property such as special test equipment for use in the performance of a federal defense contract is using that equipment for the contractor's own benefit since the test equipment is used and reused in the performance of the same contract. Consequently the Board seeks to impose tax on such items because it appears that the federal government has taken title to the property under the special tooling clauses in the contract merely for tax avoidance.

Accordingly, the Board in 1957 called for a meeting with representatives from the Aircraft Industry Association and from the federal government. At this meeting the Board presented its position that certain items, specifically special test equipment, which has previously been exempt as special tooling should, when utilized successively in the performance of contracts with the federal government, be subject to use tax. The Board apparently sought from those attending the meeting, and alleges that it obtained, acquiescence in the extension of its authority to tax specific items pursuant to its ruling described in Sales Tax Bulletin 57-22, including, inter alia, special test equipment.[9] Following the meeting, which was held June 26, 1957, the Board prepared its ruling and subsequently conducted the audits imposing the tax in accordance with the rules set forth in Bulletin 57-22, as issued and revised in 1957, and again revised in 1959. These audits resulted in the assessment of the deficiencies which Lockheed and Aerojet have disputed.

Bulletin 57-22 "relates only to special tooling acquired or manufactured by a contractor for use on the performance of a fixed price contract or subcontract with the U.S. Government for the production of tangible personal property. . . ." The relevant clause is section 3 which purports to apply the tax to certain types of such special tooling including test equipment described in subsection d. Section 3.d. applies the tax to "Test equipment which is used successively to test end products during and after the manufacturing process, and which is not built into the end product, or is not itself the end product called for by the contract. [¶] Test

---

[9]Although the term "special" is not expressly incorporated in the description of test equipment to be subjected to tax under Bulletin 57-22, the bulletin deals with "special tooling" and with test equipment as a category thereof, hence by clear implication it relates to special test equipment.

equipment not exempt as special tooling must be used successively to test the performance of end products. . . ."

The principal basis claimed by the Board for taxation of the test equipment, while acknowledging that the special tooling is exempt, is that the test equipment is not an end product. Nor is it used directly in production in the manner of tools, jigs and dies but is "used successively to test the performance of end products." (Bulletin 57-22.) Assuming, without deciding, that the requisite formalities were observed in the adoption of the ruling in Bulletin 57-22, that ruling is entitled to substantial weight with respect to statutory construction or application (*Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593]). Nonetheless, in a judicial determination relating to the effect of a ruling by the Board, we may review whether the Board properly interpreted the Sales and Use Tax Law (*ibid.*). The Board in the present cases attempts to subject to taxation property which is, and which it has for many years conceded to be, statutorily exempt. There is no substance to the alleged ground for distinguishing special test equipment which is "used successively to test the performance of end products" from special tooling which, by its nature, is used successively in the production of end products. The Board exceeds the scope of its authority, which is limited to interpretation and application of the relevant legislative enactments. The Board argues that it, like the Legislature, enjoys broad discretion in making classifications as to taxable property, relying on the *Culligan* case, *supra*. While this may be true, the Board is nonetheless required to frame its definitions of taxable property in such a manner that these fall within the ambit of the tax statutes, and to make reasonable classifications thereunder. There being no reasonable distinction between special tooling and special test equipment that would render one taxable and not the other under the Sales and Use Tax Law, any attempt to tax the possessory interest in either requires legislative action.

In making the contention that this use is a sufficient foundation for taxation of the test equipment the Board disregards the fact that ownership of the test equipment vests in the federal government under the contracts prior to such use. Our view that the Board exceeded its authority in this attempt to alter classifications of taxable property is supported by the recent decision of *C. R. Fedrick, Inc.* v. *State Bd. of Equalization* (1974) 38 Cal.App.3d 385 [120 Cal.Rptr. 434]. There the court observed the distinctions made by statute between purchases of

materials for resale to the federal government to be used for the construction of improvements to real property in California which are taxable (§ 6384) and purchases of tangible personal property for resale to the federal government which are not taxable (§ 6381). The court there observed: "Regardless of the legislative motivation, it is manifest that since section 6381 exempts from sales and use taxes all tangible personal property sold to the United States, section 6384 is an exception which imposes sales and use taxes on a certain type of personal property sold or resold to contractors under contract to the United States, to wit, personal property 'for use in the performance of contracts with the United States for the construction of improvements on or to real property in this state.' . . ." (*Id.,* at p. 396.)

Moreover, the Board in that case acknowledged the statutory limitations on taxation of movable personal property. "It is manifest that by its rules and regulations appellant [State Board of Equalization] concedes that 'Machinery and Equipment' sold to the United States is not subject to sales or use tax if it is not attached to realty, or if attached to realty, it is readily removable as a unit without damage to such real property, and is not a 'fixture.' " (*Id.,* at p. 397.)

We further note decisions relating to government contracts arising in several other jurisdictions which have sales and use tax statutes similar to those in California. These decisions have uniformly held both the sales and the use tax inapplicable to transactions involving the sale of tangible personal property to the federal government. (See, e.g., *State Tax Commission* v. *Graybar Electric Company* (1959) 86 Ariz. 253 [344 P.2d 1008]; *Day & Zimmerman, Inc.* v. *Calvert* (Tex. 1975) 519 S.W.2d 106; *Avco Manufacturing Corporation* v. *Connelly* (1958) 145 Conn. 161 [140 A.2d 479].)

III

The Board finally contends that if its ruling that special test equipment is subject to taxation under Bulletin 57-22 is ineffective or unenforceable, such equipment is nonetheless subject to use tax pursuant to section 6244. That section provides that where a resale certificate has been given at the time of the purchase of tangible personal property "any storage or use of the property other than retention, demonstration or display while holding it for sale in the regular course of business" renders the property subject to tax. The Board, in asserting this argument, disputes the operational

facts of the transactions represented by the cases at bench. The stipulated facts, which were necessarily signed by counsel for each of the parties, refute the contention that Lockheed or Aerojet had any purpose in purchasing the property other than resale to the federal government. Since by definition their business is defense contracting, this resale was "in the regular course of business" pursuant to the statutory scheme. It was for this reason that resale certificates were provided to the suppliers. Once the property was acquired by the taxpayers it was not used within the meaning of section 6244; the use was that of the federal government in which title vested.

The Board argues that although a contractor may be retaining, demonstrating or displaying while holding property for sale in the regular course of business, the company is not exempt from tax if it makes *any other* storage or use. (*Kirk* v. *Johnson* (1940) 37 Cal.App.2d 224 [99 P.2d 279].) The *Kirk* decision is inapposite since the tax was there imposed on the purchase of cows by dairymen who used them for milk production and later resold them only when they became unprofitable as milk producers. The court found that the sale by the cattle dealers to the dairymen was a taxable retail sale rather than a sale for resale since the dairymen used the cows. The intent of the dairymen to resell the cows at an undeterminate future date was insufficient to exempt the transactions from taxation.

The situation presented by the *Kirk* case is readily distinguishable from the present cases. The special tooling was acquired or fabricated by Lockheed and Aerojet pursuant to a government contract and with no purpose other than immediate resale to the federal government. ■ In order for the tax to apply, whatever use (including storage) is made of the property must occur while the purchaser is the owner since the taxable use is that incident to ownership (see, e.g., § 6009; *Levine* v. *State Board of Equalization* (1956) 142 Cal.App.2d 760, 766 [299 P.2d 738]). This interpretation of the Sales and Use Tax Law is consistent with the decision of the California Supreme Court in *Union Oil Co.* v. *State Bd. of Equal.* (1963) 60 Cal.2d 441 [34 Cal.Rptr. 872, 386 P.2d 496].

In the *Union Oil* case two bulk oil tankers were sold by Union Oil to Cienega Tanker Corporation which then leased them back to Union Oil for operation in California. The court found that use tax could properly be imposed on Cienega, the out-of-state owner, and that leasing the property for operation in California constituted a taxable use by the

*owner.* By a parity of reasoning, any purported use made of the test equipment or components thereof by Lockheed or Aerojet following their purchase for immediate resale to the federal government was the use of the owner, e.g., the United States. Our conclusion is, as we earlier observed, supported by cases from other jurisdictions involving similar issues. In these cases taxpayer-contractors acquired and retained possession of personal property which was used in performing various production operations under contracts which vested title in the federal government. (*United States* v. *Nevada Tax Commission* (D.Nev. 1968) 291 F.Supp. 530, affd. (9th Cir. 1971) 439 F.2d 435; *General Motors Corp.* v. *State Com'n. of Rev. & Tax.* (1958) 182 Kan. 237 [320 P.2d 807]; *State Tax Commission* v. *Graybar Electric Company, supra,* 344 P.2d 1008; *Avco Manufacturing Corporation* v. *Connelly, supra,* 140 A.2d 479.) In each case the state attempted to tax the property under the sales and use tax statutes similar to those enacted in California. Without exception the courts held that since the federal government became the owner neither sales nor use tax applied.

## Conclusion

In summary, we conclude that since Lockheed and Aerojet did not purchase the special test equipment at retail, but purchased it for resale in the regular course of business to the federal government, which is exempt, and since any use or storage of the equipment thereafter was that of the federal government in which title immediately vested, the transactions presented by the instant cases are not taxable under the Sales and Use Tax Law of California.

## Disposition

The judgments are, and each is, affirmed.

Lillie, Acting P. J., and Thompson, J., concurred.