[No. B036583. Second Dist., Div. Seven. Mar. 20, 1990.]

AEROSPACE CORPORATION, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Appellant.

Hill, Farrer & Burrill, Jack R. White and Vincent C. Page for Plaintiff and Respondent.

## OPINION

LILLIE, P. J.—The State Board of Equalization (Board) appeals from judgment entered in favor of the Aerospace Corporation (Aerospace) in consolidated actions for the refund of sales and use taxes levied on Aerospace for its use of certain materials purchased by it for the performance of its contracts with the federal government.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed. The following factual summary is based on the parties' stipulation of facts supplemented by exhibits.

Aerospace is, and was at all times mentioned, a nonprofit corporation organized and operated exclusively for scientific purposes. The principal purposes for which Aerospace was organized, as expressed in its articles of incorporation, are to engage in research, development and advisory services for the United States government. Aerospace's principal specialties are space systems, selected ballistics missile activities and related technology for national security purposes. Aerospace's principal customer for these specialties is the United States Air Force. Aerospace is not a manufacturer of space or missile equipment but is categorized by the Department of Defense (DOD) as a "DOD-sponsored Federal Contract Research Center," the sponsor being the United States Air Force.

Aerospace's consolidated actions for refund of sales and use taxes covered the fiscal years ending June 30, 1972, through June 30, 1978. During each of these fiscal years approximately 85 percent of Aerospace's total work effort was in the performance of a single contract entered into annually between Aerospace and the Air Force (Annual Air Force Contract). The remaining approximately 15 percent of Aerospace's total work effort during the years in issue was devoted to various other federal contracts and grants, nonfederal contracts and grants, and company-sponsored research programs.

Aerospace sought refund of taxes assessed by the Board during the period in issue for the cost of certain consumable supplies and materials purchased by Aerospace and used by it in the performance of the Annual Air Force Contract and its contracts with other agencies of the federal government. For cost accounting and billing purposes the cost of such consumable supplies and materials was charged by Aerospace to "indirect cost" included in

"overhead." Those supplies and materials are referred to herein as overhead materials.[1]

Substantially all of the overhead materials in recurrent use during the years in question were purchased and reordered in sufficient quantities to enable Aerospace to maintain a stockpile to provide for several months of normal usage. Since the overhead materials at issue herein were purchased by Aerospace pursuant to resale certificates given by Aerospace to the vendors (Rev. & Tax. Code, § 6092), no sales tax on such materials was paid at the time of purchase.

The Annual Air Force Contract and many of Aerospace's other federal contracts contained a clause specifying when title to property purchased by Aerospace for performance of the contact vests in the United States government (title clause). Such title clause reads in pertinent part: "Title to all property furnished by the Government shall remain in the Government. Title to all property purchased by the contractor, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor. *Title to other property, the cost of which is reimbursable to the Contractor under the contract, shall pass to and vest in the Government upon (i) issuance for use of such property in the performance of this contract, (ii) commencement of processing or use of such property in the performance of this contract, or (iii) reimbursement of the cost thereof by the Government in whole or in part, whichever first occurs. . . .*" (Italics added.)

Some of Aerospace's federal contracts other than the Annual Air Force Contract contained a "progress payments" title clause instead of the title clause set forth above. The progress payments title clause reads in relevant part as follows: "Immediately, upon the date of this contract, title to all parts, materials, inventories, work in progress . . . theretofore acquired or produced by the contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. . . ."

---

[1] Overhead materials include: Purchased parts (e.g., batteries, resistors and transistors) and raw materials (e.g., metal, plastic) which are consumed in operations and are not incorporated into a final product delivered to a customer; equipment and materials (e.g., test tubes, chemicals) used in Aerospace's laboratories; low value plant equipment (e.g., timers, meters, amplifiers) the cost of which is not capitalized; perishable tools (e.g., hammers, drills, screwdrivers); maintenance and repair supplies (e.g., janitorial supplies); low value office equipment (e.g., typewriter stands, card files) the cost of which is not capitalized; and office supplies (e.g., stationery, printed forms, paper clips).

For cost accounting and billing purposes Aerospace maintains, and during each of the fiscal years in issue maintained, what is known as a job order cost accounting system. Pursuant to that system Aerospace assigns a separate and distinct job order or group of job orders to each contract or project in order to determine the cost of performing such contract or project. On a weekly basis direct labor (mostly engineering and scientific labor) based on time cards, as well as any other direct costs (mostly materials) attributable to each specific job order, is charged directly to that job order. Indirect cost or overhead, including the cost of overhead materials and indirect labor, is then allocated to each direct job order on the basis of an overhead rate (recomputed monthly from the beginning of the fiscal year to date) times the direct labor dollars charged to that job order. The overhead rate is determined by dividing total overhead costs by a total labor base consisting of all direct contractual labor plus project labor on research in support of contractual efforts, company-sponsored research projects and bid and proposal efforts.

During the period in question Aerospace submitted billings to the Air Force pursuant to the payment clause in the Annual Air Force Contract on a weekly or biweekly basis for all direct and indirect costs incurred on all job orders pertinent to the Annual Air Force Contract during the billing period.[2] Aerospace submitted weekly, biweekly or monthly billings on all of its other federal contracts for all direct and indirect costs incurred during the billing period. Billings for the Annual Air Force Contract usually were paid within 2 or 3 days of the billing date; billings for other federal contracts usually were paid within 30 to 60 days. Exhibits submitted by the parties show that approximately 85 percent of the cost of all overhead materials purchased by Aerospace during each of the fiscal years in question was reimbursed by the federal government under the Annual Air Force Contract. With respect to the remaining approximately 15 percent of Aerospace's total purchased overhead materials each year, approximately 60 percent of the cost thereof was reimbursed by the government under title clauses contained in the other federal contracts.

---

[2] The United States Government Cost Accounting Standards, promulgated by the Cost Accounting Standards Board and required to be used by contractors with respect to all negotiated national defense contracts and subcontracts in excess of $100,000, define the terms "direct cost" and "indirect cost" as follows:

"*Direct Cost.* Any cost which is identified specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.

"*Indirect Cost.* Any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective." (4 C.F.R 402.30(a)(3),(5); 4 C.F.R 418.20(a)(2),(3).)

In order to assure an efficient and cost-effective flow of work and management throughout the Aerospace organization, operational functions (e.g., laboratory operations, engineering and science operations) are separated from administrative and service functions (e.g., personnel, security and safety, financial). Within these general categories are various "cost centers" or suborganizations which perform certain specific functions. The work effort in many cost centers is devoted entirely to the Annual Air Force Contract or to that contract and other federal contracts containing title clauses. The work effort in other cost centers is devoted to a varying mix of contracts with title clauses, contracts without title clauses and company-sponsored research. Once received by a particular cost center, by requisition or otherwise, overhead materials may be used exclusively in the performance of one category of contract or in the performance of more than one category in various combinations.

During each of the fiscal years in question Aerospace employed cost accounting procedures whereby it identified the cost of overhead materials in three ways: (1) by an expense account number to indicate the type of material purchased and used; (2) for billing and contract budgeting purposes, by job order designating the purpose of the expense. A direct job order was used to indicate material used in performing a specifically identified contract or company-sponsored program the cost of which was required or permitted to be charged as a direct cost of such contract or program. An indirect job order was used to indicate overhead materials purchased for use in performing Aerospace's contracts and programs the cost of which was required or permitted to be charged as an indirect cost included in overhead allocable to all contracts and programs for billing and reimbursement purposes; (3) for internal cost control and budgetary purposes, by cost center designating the storing or using organization within the company.

Aerospace cannot trace every specific item of its overhead materials to use in the performance of a particular contract by requisition forms or other specific documentation.

In its original audit of Aerospace for the period July 1, 1971 to June 30, 1975, the Board concluded that Aerospace was liable for tax on the purchase of certain categories of overhead materials and deficiencies were determined. Such deficiencies initially were based on the Board's interpretation of its General Bulletin 59-9.[3] In applying General Bulletin 59-9 the

---

[3] General Bulletin 59-9 provided in pertinent part: "The tax does not apply to sales to United States contractors or subcontractors of supplies and materials allocated to overhead costs, reimbursable by the Government under cost or cost-plus-fixed-fee contracts under which title to the property passes to the Government before use . . . and, effective May 1, 1959, used ex-

Board conducted a "cost center" analysis under which Aerospace's various cost centers established for management, budgetary and cost control purposes were determined to be either "qualifying" or "nonqualifying" and the overhead materials consumed in said cost centers were either exempted or taxed on the following basis: if no more than one percent of the direct labor performed in a particular cost center during a test period (usually a calendar quarter) was charged to job orders other than federal contracts with title clauses, the cost center was classified as qualifying. Conversely, if more than one percent of the direct labor performed in a cost center during the test period was charged to job orders other than federal contracts with title clauses, the cost center was classified as nonqualifying. After so classifying each cost center as either qualifying or nonqualifying, the Board determined that all overhead materials charged (by requisition or purchase order) or otherwise allocated to qualifying cost centers satisfied the "used exclusively" requirement of General Bulletin 59-9 and such materials were considered exempt from tax. Conversely, the Board determined that none of the overhead materials charged or otherwise allocated to nonqualifying cost centers satisfied the "used exclusively" requirement of General Bulletin 59-9 and all of such materials were found to be taxable.

The Board conducted a reaudit for the period July 1, 1971 to June 30, 1975 using the revised criterion that a cost center is qualifying only if 100 percent of its direct labor was charged to job orders on federal contracts with title clauses; if any direct labor was charged to non-title clause job orders the Board considered the cost center to be nonqualifying. The Board then presumed (1) that title to all overhead materials charged or otherwise allocated to qualifying cost centers passed to the federal government prior to any use by Aerospace, and (2) that title to overhead materials charged or allocated to nonqualifying cost centers did not pass to the federal government prior to use by Aerospace. Based on such presumptions, only overhead materials charged or allocated to qualifying cost centers were deemed to be exempt from the sales and use tax.

With respect to overhead materials the Board's audit of Aerospace for the period July 1, 1975 to June 30, 1978 was conducted in accord with the same "all or nothing" cost center classification and title passage presumptions employed in the reaudit for the period July 1, 1971 to June 30, 1975.

On August 27, 1980, during the pendency of proceedings challenging the Board's assessment of sales and use tax deficiencies for the period July 1,

---

clusively in the performance of such cost or cost-plus-fixed-fee contracts with the Government. [¶] On and after May 1, 1959, the tax applies with respect to sales to contractors of supplies and materials allocated to overhead costs and used in performing cost or cost-plus-fixed-fee contracts with the Government if such supplies and materials also are used in performing fixed-price contracts with the United States or contracts with other parties."

1971 to June 30, 1975, the Board repealed General Bulletin 59-9 and issued Operations Memo No. 680, looking toward revision of Regulation 1618. (Cal. Code Regs., tit. 18, § 1618; hereafter Regulation 1618.) On August 17, 1983, during the pendency of proceedings challenging the Board's determination of sales and use tax deficiencies for the period July 1, 1975 to June 30, 1978, the Board adopted Regulation 1618 as revised. Inasmuch as Regulation 1618 contains no provision limiting its retroactive effect (see Rev. & Tax. Code, § 7051), it is applicable in these consolidated actions.

Aerospace paid the sales and use tax deficiencies assessed and timely filed claims for refund. Following denial of those claims Aerospace filed two separate actions, the first for refund of taxes paid for the period July 1, 1971, to June 30, 1975 (case No. C-416134) and the second for refund of taxes paid for the period July 1, 1975, to June 30, 1978 (case No. C-578611). Pursuant to order of the court the actions were consolidated for all purposes. The matter was submitted on stipulated facts, exhibits, and the testimony of a witness for Aerospace.

The trial court issued a statement of decision wherein the court found: Aerospace's allocation of overhead materials to specific contracts based on the direct labor performed on each contract is a reasonable method of allocation which conforms to governing federal regulations and generally accepted accounting principles. Under the provisions of the fixed-price contracts at issue, title to that portion of the overhead materials allocated to such contracts by Aerospace vested in the federal government upon allocation. This provision precludes the possibility of a taxable use of such overhead materials by Aerospace before title to the materials vested in the government. Under the provisions of the cost reimbursement contracts at issue, title to that portion of overhead materials which was allocated to such contracts by Aerospace vested in the federal government upon issuance for use (i.e., allocation to the contracts), commencement of use, or reimbursement of the cost thereof by the government, whichever first occurred. Under these provisions and governing federal regulations, overhead materials allocated to specific cost reimbursement contracts on a reasonably acceptable basis, such as direct labor, were issued for use in the performance of those contracts, thereby vesting title in the government as to all such allocated materials even before reimbursement of their cost by the government.

The court further determined that Regulation 1618 is invalid because it ignores the title-passing events specified in the title clauses of the government contracts, providing instead that title to overhead materials passes to the government only if the cost of the materials is allocated to cost centers engaged exclusively in the performance of such contracts.

Judgment was entered for refund of taxes overpaid by Aerospace in the sums of $349,089 (case No. C-416134) and $377,444 (case No. C-578611), plus interest on such sums. This appeal followed.

DISCUSSION

I

■    Revenue and Taxation Code section 6051[4] imposes a sales tax, computed as a percentage of gross receipts, upon all retailers for the privilege of selling tangible personal property at retail. Section 6006 defines "sale" as "(a) Any transfer of title or possession . . . of tangible personal property for a consideration" and section 6007 defines retail sale as "a sale for any purpose other than resale in the regular course of business." Hence, a sale of property is not a retail sale subject to the sales tax if the buyer plans to resell the property in the regular course of his business. (*Standard Oil Co.* v. *State Bd. of Equalization* (1965) 232 Cal.App.2d 91, 95 [42 Cal.Rptr. 543].)
■    Such an intention was evidenced by the resale certificates given by Aerospace to the vendors of overhead materials. (§ 6092.) The certificates relieved the vendors from liability for sales tax (*Burroughs Corp.* v. *State Bd. of Equalization* (1984) 153 Cal.App.3d 1152, 1158, fn. 2 [200 Cal.Rptr. 816]) and Aerospace paid none at the time of purchase. Aerospace's subsequent resale of overhead materials to the government likewise was not taxable because section 6381 exempts from the computation of the amount of sales tax the gross receipts from the sale of tangible personal property to the United States.

As an alternative basis for taxation section 6201 imposes a use tax on the storage, use or other consumption of tangible personal property.[5] The sales tax and the use tax are designed to be complementary. Thus, section 6094, subdivision (a) provides: "If a purchaser who gives a resale certificate makes any use of the property other than retention, demonstration, or display while holding it for sale in the regular course of business, the use shall be taxable to the purchaser . . . as of the time the property is first used by him . . . ." (See also § 6244.) ■    However, where the federal government receives title to property pursuant to the provisions of its contract with a

---

[4]Unless otherwise indicated, all statutory references are to the Revenue and Taxation Code.

[5]Section 6008 defines "storage" to include "keeping or retention in this State for any purpose except sale in the regular course of business . . . of tangible personal property purchased from a retailer."

Section 6009 defines "use" to include "the exercise of any right or power over tangible personal property incident to the ownership of that property . . . except that it does not include the sale of the property in the regular course of business."

civilian contractor, any use of the property made by the contractor in performing the contract after title has passed to the government under the terms of the contract is deemed to have been made on behalf of the government and such use therefore is not taxable. (*Lockheed Aircraft Corp.* v. *State Bd. of Equalization* (1978) 81 Cal.App.3d 257, 265-266 [146 Cal.Rptr. 283].)

## II

Regulation 1618 sets forth the requirements fixed by the Board for the passage of title to overhead materials to the United States for the purpose of determining the applicability of the sales and use tax to the contractor's purchase or use of such materials. Regulation 1618 provides in pertinent part: "Overhead Materials. In a case where the entire 'overhead material' account is allocated exclusively to cost centers or separate locations involved only in government cost reimbursement contracts and/or fixed-price contracts with a progress payments clause during the period of such allocation, for a complete reporting quarter, title to the property will pass to the United States prior to use by the contractor, and the purchase and use of the property by the contractor is nontaxable. If 'overhead materials' are charged to an expense account which is then allocated to various locations, cost centers or contracts, some of which are not exclusively engaged in cost reimbursement contracts and/or fixed-price contracts with a progress payments clause, it will be considered that title did not pass to the United States prior to use of the property, and tax will apply with respect to the purchase or use of all the property charged to the overhead expense account, unless the overhead item is specifically accounted for as being charged to a specific contract, pursuant to the terms of which title passes to the United States prior to the use of the item, through some type of requisition, work order or similar accounting device. The time at which title to the consumable supplies and overhead materials passes to the United States will be determined in accordance with the terms of the contract, including the title clause, if any." (Reg. 1618, subd. (b) (2).)

■ The Board contends the trial court improperly determined that Regulation 1618 is invalid as a basis for the Board's assessment of tax deficiencies on overhead materials purchased by a contractor for the performance of its contracts with the federal government.

The Legislature has delegated to the Board the duty of enforcing the sales and use tax law and the authority to prescribe and adopt rules and regulations. (§ 7051; *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1020 [106 Cal.Rptr. 867].) ■ Where, as here, the Board has adopted a formal regulation which

determines the classification of the taxable event without interpretation or construction of the regulation, the proper standard of review is whether the regulation is arbitrary, capricious or without rational basis. (*Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60, 65-66 [219 Cal.Rptr. 142, 707 P.2d 204]; *Cal-Metal Corp.* v. *State Bd. of Equalization* (1984) 161 Cal.App.3d 759, 763-764 [207 Cal.Rptr. 783].) "[T]here is no agency discretion to promulgate a regulation which is inconsistent with the governing statute. . . . Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to [,] strike down such regulations." (*Ontario Community Foundations. Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816-817 [201 Cal.Rptr. 165, 678 P.2d 378]; internal quotation marks and italics omitted.)

In *Lockheed Aircraft Corp.* v. *State Bd. of Equalization, supra*, 81 Cal.App.3d 257, it was held that title to property acquired for the performance of a contract with the federal government vests in the government in accordance with the title provisions of the contract; within the meaning of the sales and use tax law a resale of such property by the contractor to the government occurs at the time title vests in the government under the contract; any use of the property by the contractor after title has passed to the government is a use of property owned by the government and such use is not subject to the use tax. (*Id.*, at pp. 265-268.) Regulation 1618 purports to recognize these principles by providing that "[t]he time at which title to the consumable supplies and overhead materials passes to the United States will be determined in accordance with the terms of the contract, including the title clause, if any." However, other provisions of the regulation ignore that criterion, stating that "it will be considered that title did not pass to the United States prior to use of the property" if the overhead materials are charged to an expense account which is allocated to cost centers some of which are not exclusively engaged in the performance of contracts with the federal government.

Under the title clause of the Annual Air Force Contract and some of Aerospace's other contracts with the federal government, title to overhead materials acquired by Aerospace for the performance of the contracts passes to the government upon "(i) *issuance for use* of such property in the performance of this contract, (ii) *commencement of* processing or *use* of such property in the performance of this contract, or (iii) *reimbursement of the cost* thereof by the Government in whole or in part, *whichever first occurs.*" (Italics added.) The title clause of some of Aerospace's other federal contracts provided that title to all property acquired by the contractor and allocable to the contract under sound and generally accepted account-

ing principles "shall forthwith vest in the Government upon said . . . allocation."

The trial court found: "Under these [title] provisions and governing federal regulations, overhead materials allocated to specific cost reimbursement contracts on a reasonably acceptable basis, such as direct labor, were issued for use in the performance of those contracts, thereby vesting title in the Government as to all such allocated materials even before reimbursement of the cost thereof by the Government."[6] That finding is supported by substantial evidence. Donald Warner, taxes and regulations administrator for Aerospace and a certified public accountant, testified that "issuance for use" in the title clause of the Annual Air Force Contract is equivalent to allocation. Mr. Warner further testified: Aerospace allocates the costs of overhead materials to indirect job orders, which in turn carry those costs to the various contracts, on the basis of direct labor. Direct labor is a reasonably reliable and generally accepted basis for allocating overhead costs to contracts because under accounting principles it is presumed that the quantity of overhead materials allocated to a contract based on direct labor is the quantity that is going to be used in performing that contract. This method of allocating indirect costs used by Aerospace is authorized by Armed Services Procurement Regulations (ASPR), appendix B, part 3,[7] which permits the contractor to substitute a system of financial accounting in lieu of physical segregation and identification of materials to each contract. It was stipulated that substantially all of the overhead materials in recurrent use during the years in question were purchased and reordered in sufficient quantities to enable Aerospace to maintain a stockpile to provide for several months of normal usage. Mr. Warner testified that Aerospace typically maintained a three-month supply of materials on hand. Inasmuch as Aerospace's billing cycle provides for payment in less than three weeks,

[6] The Board argues that we are not bound by the trial court's findings because the case was submitted on a stipulation of facts and evidence which merely supplemented the stipulation. (See *Oliver & Williams Elevator Corp.* v. *State Bd. of Equalization* (1975) 48 Cal.App.3d 890, 893-894 [122 Cal.Rptr. 249].) We do not agree. Inasmuch as the stipulation of facts set forth evidentiary material only, it was proper for the trial court to make findings of ultimate facts. (*Taylor* v. *George* (1949) 34 Cal.2d 552, 556 [212 P.2d 505].) If those findings are supported by substantial evidence the judgment may not be disturbed. (*Hugo Neu Corp.* v. *County of Los Angeles* (1966) 241 Cal.App.2d 703, 706 [50 Cal.Rptr. 916].)

[7] ASPR, B-303 provides in pertinent part: "(e) *Multi-contract Cost and Material Control.* [¶] (i) *Description and Scope.* A multicontract cost and material control system constitutes a modification of the requirements for physical identification of Government material and substitutes therefor a system of financial accounting. The system operates as follows: [¶] (A) The contractor may acquire, purchase, requisition, receive, store, and issue like items of material for the total requirements of all contracts involved in the system without identifying the material to each contract. . . . [¶] (C) In lieu of physical segregation and identification to individual contracts, periodic calculation of requirements and distribution of costs to all contracts permits the allocation of material costs to products delivered. . . ."

reimbursement was for materials *received* during the billing period; with minor exceptions the materials *used* during the billing period were received by Aerospace and paid for by the government during an earlier billing period. Mr. Warner estimated that only about 1 percent of overhead materials allocated to government title clause contracts was not paid for by the government prior to use.

Under Regulation 1618 it is presumed that title to overhead materials does not pass to the government prior to their use if the materials are charged to an expense account which is then allocated to cost centers some of which are not exclusively engaged in the performance of government title clause contracts. Such presumption is contrary to the rule that title clauses of contracts with the federal government determine passage of title to materials used in performance of the contract to the government for purposes of the sales and use tax law. (*Lockheed Aircraft Corp.* v. *State Bd. of Equalization, supra*, 81 Cal.App.3d 257, 265-266.) The presumption also is inapplicable under the facts of this case. Aerospace identified the cost of overhead materials in three ways, one of which was by cost center designating the storing or using organization within the company. The stipulation of facts states that such method of identification was for internal control and budgetary purposes. Mr. Warner testified that cost center classification has nothing to do with contract costing or billing.

### III

■ The Board contends Regulation 1618 is a proper exercise of the Board's authority because it is consistent with section 2401 of the California Uniform Commercial Code which reads in part: "Title to goods cannot pass under a *contract for sale* prior to their identification to the contract (Section 2501) . . . ." (Italics added.) The purpose of this identification requirement "is to determine the point in time when the buyer has an insurable interest in the goods or a special property interest that has relevance in a variety of contexts, such as when the goods are lost or the seller becomes insolvent prior to delivery." (*Martin Marietta Corp.* v. *N. J. Nat. Bank* (3d Cir. 1979) 612 F.2d 745, 749.)

■ California Uniform Commercial Code section 2401 is inapplicable to the contracts in the present case which are not "contracts for sale," but contracts for Aerospace's rendition of services to the federal government. The fact they include provisions for vesting of title to materials used in the performance of the contracts in the government does not make them contracts of sale. Further, as previously emphasized, for purposes of the sales and use tax law title to property used in the performance of federal contracts passes to the government in accordance with the terms of the title

clauses of such contracts. For those purposes other requirements for the passage of title to property, such as that set forth in section 2401 of the California Uniform Commercial Code, are irrelevant and inapplicable.

## IV

Citing *Wallace Berrie & Co.* v. *State Bd. of Equalization, supra*, 40 Cal.3d 60, the Board contends Regulation 1618 properly requires that if the cost center standard is not met, title to an overhead item will be considered to have passed to the government only if such item, through requisition, work order or similar accounting device, is charged to a specific government title clause contract pursuant to the terms of which title vests in the government prior to use of the item. In *Wallace Berrie* a wholesaler purchased cardboard display racks for distribution to its retail customers, giving the manufacturer of the racks a resale certificate at the time of purchase. The Board notified the wholesaler that it was liable for a use tax on the racks because the wholesaler failed to satisfy the requirement of Regulation 1670, subdivision (c) governing the sale of marketing aids (Cal. Code Regs., tit. 18, § 1670, subd. (c)). Regulation 1670, subdivision (c) provides that a marketing aid will be deemed to have been sold if the supplier obtains reimbursement equal to 50 percent of the purchase price, either by making a separate charge or by increasing the regular sales price of the merchandise sold with the marketing aid, but that the supplier will be deemed to be the consumer of the marketing aid if it fails to obtain such reimbursement. The court noted that where a wholesaler gives the manufacturer a resale certificate for goods purchased, the manufacturer is relieved of liability for sales tax. If the wholesaler subsequently makes use of the goods without reselling them, a use tax is due. Accordingly, the Board must have some means to distinguish a sale from a use. Regulation 1670, subdivision (c) provides such guidance and therefore is not arbitrary, capricious or without rational basis. (*Wallace Berrie, supra*, 40 Cal.3d at pp. 67-70.)

A like rationale does not apply to Regulation 1618. The regulation under consideration in *Wallace Berrie* was not shown to conflict with any judicial decision as to what may be recognized as consideration for purposes of the sales and use tax law. In stark contrast Regulation 1618 conflicts with *Lockheed*'s holding that for purposes of the sales and use tax statutes title to property purchased for the performance of a federal contract vests in the government pursuant to the title clause of that contract. Inasmuch as the title clauses in the present case do not require proof of allocation of overhead materials to a specific contract in order for title to such materials to vest in the government, Regulation 1618's requirement of such proof is contrary to the sales and use tax law as interpreted by judicial decision and therefore is arbitrary and without rational basis as applied herein. In any

event, under the definition of direct consumable supplies in the regulation,[8] allocating an item of overhead material to a specific contract makes it a direct consumable supply item rather than an item of overhead material.

## CONCLUSION

Aerospace's resale of overhead materials to the federal government under its contracts with the government was exempt from sales tax under section 6381. Inasmuch as Aerospace's use of the materials occurred after title thereto passed to the government under the title clauses of the contracts, such use was exempt from the use tax.

Regulation 1618, under which the Board reached a contrary conclusion, is arbitrary, beyond the board's rulemaking authority, and therefore invalid, because by providing that title to overhead materials passes to the government on terms different from those specified in the title clauses of the contracts, the regulation ignores the interpretation of the sales and use tax law set forth in *Lockheed Aircraft Corp.* v. *State Bd. of Equalization, supra,* 81 Cal.App.3d 257.

## DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods (Fred), J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 1990.

---

[8] Regulation 1618 defines "direct consumable supplies" as "supplies, tools, or equipment consumed in the performance of a contract which are specifically identified to the contract and the actual cost of which is charged as a direct item of cost to the specific contract." (Reg. 1618, subd. (a) (2).)